JOSEPH PRIDGEN & another *vs.* BOSTON HOUSING AUTHORITY & others.

Suffolk.    September 19, 1973. — March 5, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Negligence,* Elevator, One owning or controlling real estate, Trespasser, Of contractor. *Wanton or Reckless Conduct. Agency,* Scope of authority or employment. *Practice, Civil,* Damages, Leave reserved, Variance, Amendment.

A finding of negligence of the manufacturer of an elevator toward a young boy who climbed through the escape hatch onto the roof of the elevator, which had no railing, slipped from the roof into the elevator shaft, and then was crushed by the elevator was not warranted where it appeared that the elevator had been constructed in conformity to architectural specifications and regulations of the Department of Public Safety. [700-701]

In a contract for maintenance of the elevators in a housing project, provisions that the maintenance company should not be required to maintain the elevator cars governed, as to the cars, a later provision that the company must "arrange for all necessary replacements and . . . make all repairs"; and a finding of negligence or of wanton or reckless conduct of the company toward a young boy who climbed through the escape hatch of an elevator onto its roof, slipped off the roof into the elevator shaft, and was then crushed by the elevator could not be founded on the fact that the cover of the hatch was missing after the accident. [701-702]

A company whose contract for maintenance of the elevators at a housing project of more than one building required it to have an elevator maintenance man on duty at the project during regular working hours could not be found liable for negligence or wanton or reckless conduct to a boy injured in an elevator accident in one of the buildings on the ground that the maintenance man on duty at the project was not in the particular building where the accident occurred when it occurred, or on the ground that the maintenance man had "exclusive possession" of the keys to the place where the power controls of the elevator were located where it appeared that the superintendent of the project also had such keys. [702-703]

The proprietor of a housing project could not be found guilty of wanton or reckless conduct toward a boy who, as a trespasser, climbed through the escape hatch onto the roof of an elevator, which had no railing, slipped off the roof into the elevator shaft, and then was crushed by the elevator, even though a janitor employed by the proprietor failed to shut off the power to the elevator when he knew that the boy was trapped in the shaft. [703-705]

Discussion of the duty of an owner or an occupier of realty toward a trespasser known to be trapped in a position of peril. [706-710]

An owner or occupier of realty owes to a trespasser thereon who is known to be trapped in a position of peril the duty to exercise reasonable care to prevent injury or further injury to him, including, if necessary, the duty to take reasonable affirmative action. [710-713]

Evidence that after a boy trespassing on an elevator in a building had fallen into and was trapped in the elevator shaft a janitor employed by the owner of the building was present at the scene of the accident, knew that the boy was so trapped, and, although his ordinary duties did not include having charge of the electrical system, in such emergency would have been within the scope of his employment in shutting off the electrical power to the elevator, and could have, but did not, shut off the power before the elevator moved and crushed the boy warranted conclu-

sions that the janitor was negligent toward the boy and that the owner was liable to the boy for the janitor's negligence. [713-715]

On the record of an action, there was no merit in a contention that a variance between specifications by the plaintiffs as to the theory of negligence on the part of the defendant and the theory established upon a full and fair trial should be held fatal; rather, after verdicts for the plaintiffs, it was appropriate for this court, under G. L. c. 231, §§ 51, 125, to give the plaintiffs leave to amend their declaration to conform to the proof. [716-717]

TORT. Writ in the Superior Court dated October 3, 1966.

The action was tried before *Moynihan, J.*

*Eugene F. Sullivan* (*S. Roy Remar & Allan Robinson* with him) for the plaintiffs.

*Warren Delaney* for Boston Housing Authority.

*William H. Clancy* (*Thomas D. Burns* with him) for Consolidated Elevator Co., Inc.

*Charles J. O'Malley* for Westinghouse Electric Corporation.

QUIRICO, J. This is an action of tort in which Joseph Pridgen, a minor, seeks to recover from the Boston Housing Authority (the authority), the Consolidated Elevator Company (Consolidated) and the Westinghouse Electric Corporation (Westinghouse) for personal injuries sustained by him while he was trapped in the elevator shaft of a building owned by the authority. His mother, Minnie Lee Pridgen, seeks to recover from the same three defendants for consequential damages. Each plaintiff alleges in a separate count that Joseph's injuries were caused (1) by the authority's negligence, (2) by the authority's wilful, wanton or reckless conduct, (3) by Consolidated's negligence, (4) by Consolidated's wilful, wanton or reckless conduct, and (5) by Westinghouse's negligence.

The case is before us on various exceptions of the plaintiffs, including principally their exceptions to several rulings and orders of the trial judge which resulted ultimately in the entry of verdicts for all defendants on all counts.

On the basis of substantially undisputed evidence, the accident in which the plaintiff Joseph Pridgen was injured may

be described as follows. On June 28, 1966, Joseph was eleven years old and lived with his mother at 114 Heath Street, Jamaica Plain, in an apartment building which is part of the Bromley Heath housing project owned by the authority. On the afternoon of that day he went to visit a friend who lived at 20 Bickford Street in another apartment building also owned by the authority and located in the same housing project. Joseph, his friend and one other boy entered the elevator in the Bickford Street building, climbed up through an escape hatch opening in the ceiling of the elevator car, and got onto the platform which formed the top or roof of the car. While they were on the car roof, Joseph's friend caused the car to move up and down by pressing a button located on the top of the car. At some point during this process Joseph slipped from the roof platform into the elevator shaft and was caught on metal brackets extending out from the shaft walls. He was trapped with his legs straddling the brackets and he was looking up toward the elevator. While he was in this position, the elevator moved down and struck him, crushing him and injuring him severely. An emergency call was made to the Boston Fire Department whose members arrived, turned off the electrical power to the elevator, removed Joseph from the elevator shaft and took him to the hospital.

Additional evidence bearing on the conduct of particular defendants will be discussed later in this opinion.

At the close of the evidence the judge directed verdicts for the defendants as follows: for Westinghouse on all counts against it (two counts alleging negligence), for Consolidated on all counts against it (two counts alleging negligence and two alleging wilful, wanton or reckless conduct) and for the authority on two counts against it (those alleging wilful, wanton or reckless conduct). By directing these verdicts the judge appears to have ruled that (a) if the plaintiffs were entitled to recover on proof of negligence alone, the evidence was insufficient to permit a finding of negligence on the part of Westinghouse or Consolidated, and (b) if, as a matter of law, Joseph and his two companions were trespassers when

they went through the escape hatch in the ceiling of the elevator car and got on top of the car, at that point Consolidated and the authority owed Joseph the duty only to refrain from wilful, wanton or reckless conduct and the evidence was insufficient to permit a finding of such conduct on the part of either Consolidated or the authority. We conclude that the action of the judge in directing the verdicts for the defendants on these counts was not error.

The judge allowed the two counts alleging negligence on the part of the authority to go to the jury. However, by his instructions he limited the jury to the consideration and determination whether the authority was guilty of negligence by reason of anything which it or its agents, servants or employees did or failed to do after learning that Joseph had slipped off the roof of the elevator car and had become trapped in the elevator shaft. The jury apparently found that the authority was guilty of such negligence and they returned a verdict for Joseph in the amount of $175,000 and one for his mother in the amount of $25,000. The judge took the two verdicts under leave reserved (G. L. c. 231, § 120), and later, on motion of the authority, he ordered that they be set aside and that a verdict be entered for the authority on each of these two counts. We conclude that the action of the judge in setting aside the verdicts on these two counts was error. The reasons for our conclusions will be discussed separately as to each defendant. In determining whether the judge correctly directed or entered verdicts for the several defendants, we must consider the evidence separately as to each defendant, in its light most favorable to the plaintiffs. *Carr* v. *Arthur D. Little, Inc.* 348 Mass. 469, 471 (1965). *Randolph* v. *Five Guys From Boston, Inc.* 354 Mass. 730, 731 (1968).

1. *The Direction of Verdicts for Westinghouse.* The plaintiffs argue that Westinghouse should have foreseen that children as well as adults would use the elevator in question and that it was negligent in the manufacture of the elevator with particular reference to the installation of the escape hatch in the ceiling and roof of the elevator car and the failure to provide adequate safety devices on the roof. We do

not agree.

There was undisputed evidence which showed the follow-ing.Westinghouse designed, manufactured and installed the elevators in the Bromley Heath housing project, including the elevator in the Bickford Street building, according to spec-ifications which were approved by the architect for the proj-ect. The elevators were installed in 1954, were accepted by the general contractor for the project and were last serviced by Westinghouse in January, 1955. There was an emergency operating or stop switch on the roof of the elevator in the Bickford Street building the day after Joseph Pridgen's acci-dent, but no railing. A stop switch was called for in the elevator's design, and manufacturing specifications required such a switch, but they did not require a railing or other type of safety device on the roof. The specifications did provide for an emergency exit or "escape hatch" in the ceiling of the elevator car, and required it to have a cover, but gave no details concerning the method of fastening such cover. The cover was missing the day after the accident. The Depart-ment of Public Safety elevator code regulations in effect on June 28, 1966, the day of the accident, required that "top emergency exit" covers be removable both inside and out-side the elevator.

The design and manufacture of the elevator by Westing-house complied with the architect's specifications and also with the Department of Public Safety's elevator regulations in effect at the time of the accident. The evidence would not warrant a jury in finding Westinghouse negligent. There was no error in the direction of the verdicts for Westinghouse.

2. *The Direction of Verdicts for Consolidated.* In 1964 Consolidated contracted with the authority to provide main-tenance service for the twenty-one elevators in the Bromley Heath housing project until April, 1967. The contract pro-vided that "[t]he work required to be performed . . . shall be done to and for each elevator and everything which was furnished with each of them *except car enclosures* (emphasis supplied) . . . provided, however, that . . . [Consolidated] shall *not* be required to: (1) repair, maintain, replace, or

refinish car enclosures . . ." (emphasis in original). The contract defined the words "car enclosure" to mean the elevator car and there appears to be no dispute that the car includes, as a part thereof, the escape hatch and hatch covers in the car roof. The contract thereafter provided that "[i]t shall be the duty of . . . [Consolidated] to arrange for all necessary replacements and to make all repairs that may develop irrespective of their nature or causes."

The plaintiffs argue that the provision appearing later in the contract superseded the earlier provision excluding the "car enclosure," and that the contract as thus interpreted made Consolidated responsible for seeing to it that the escape hatch cover on the car was in place, and for replacing the cover if it was found missing. They then argue that since the cover was missing from the car where the plaintiff Joseph Pridgen was injured on the day of the accident, the evidence was sufficient to permit the jury to find that Consolidated was liable to the plaintiffs. We do not agree.

The language of the contract is clear on the point that Consolidated was not responsible for the elevator cars or the escape hatch covers. The correct interpretation of the two quoted contract provisions is that the earlier definitional limitations and exclusions applied equally to the later provision relating to repairs and replacements.

We hold as a matter of law that Consolidated was not contractually responsible for the condition of the elevator car or "car enclosure" involved in this case.

The plaintiffs further argue that in any event their counts against Consolidated, both those alleging negligence and those alleging wilful, wanton or reckless conduct, should have been submitted to the jury for verdict on the basis of Consolidated's alleged violation of the contract provision that "[a]t least one (1) [elevator] maintenance man shall be on duty at . . . [the Bromley Heath] project during regular working hours of the regular working days of the elevator trade." Admittedly an employee of Consolidated was assigned as a maintenance man at the project and had possession of a key to the rooms in the Bickford Street building in

which the power switches and controls for the elevator in question were located. The argument of the plaintiffs seems to be that Consolidated could have been found liable either because its employee had "the exclusive possession of the keys" in question, or because that employee was not present in the particular building where the accident happened when it happened. The argument is without merit. The contract required Consolidated to have a maintenance man on duty at the project; it did not require him to be in any particular project building at all times or at the time of the accident. As to the keys there was undisputed evidence that the superintendent of the project also had keys to the elevator control rooms.

We hold that the evidence was not legally sufficient to permit the jury to find that Consolidated was guilty of either negligence or of wilful, wanton or reckless conduct.[1] There was no error in the direction of the verdicts for Consolidated on all counts against it.

3. *The Direction of Verdicts for the Authority — Summary of Additional Evidence Relating to the Authority.* Our consideration of the exceptions to the direction and entry under leave reserved of verdicts in favor of the authority requires us to summarize evidence relating specifically to the authority which was not summarized earlier, and to state it in its aspect most favorable to the plaintiffs.

Joseph's mother, the plaintiff Minnie Lee Pridgen, testified that she had returned home about 4 P.M. on the day of the accident and that her son had gone out to play immediately thereafter. A few minutes later, one of her son's friends ran into her house and told her that Joseph was "in the elevator." She went immediately to the project building where the elevator was located (the building at 20 Bickford Street) and called to her son in the elevator shaft. She saw a man standing in the hallway and asked him for help but he

---

[1] The discussion of what constitutes "wilful, wanton or reckless conduct" is deferred to our consideration of the plaintiffs' exceptions to the direction of verdicts for the authority on the counts against it alleging such conduct.

answered that there was nothing he could do, and he did not respond to her second request that he get help for her. She then asked him how to turn off "the lights" in the elevator shaft. At this point a policeman entered the building and asked her if "the lights" were turned off, and she answered that they were not. The policeman asked the man from whom Mrs. Pridgen had requested help if he worked there and he answered that he did. The policeman then asked him how to turn off "the lights"; he answered "down these stairs," and the policeman ordered him to go turn off "the lights." Mrs. Pridgen saw the man head down the stairs, although she did not know whether he turned off "the lights" as she was ordered by the firemen to leave the building almost immediately thereafter. At a point after she had asked the man in the hallway for help, but before the policeman arrived, she heard the elevator move and her son scream that he was "meshed."

At the trial Mrs. Pridgen identified a man sitting in the court room as the one to whom she had spoken in the hallway of the Bickford Street building, and she said he was called Bill. It was undisputed that the man so identified was named William Carney, and that he was in fact employed by the authority as a janitor or maintenance man at its Bromley Heath housing project at the time of the accident.

While there was evidence which was contrary to that of Mrs. Pridgen in material respects, we do not summarize it because the plaintiffs are not bound by it and the jury were free to disbelieve it. *Kelly* v. *Railway Exp. Agency, Inc.* 315 Mass. 301, 302 (1943).

The evidence as it relates to the authority has now been summarized in two parts. The first summary appearing early in the opinion deals with the design and construction of the elevator in question and with its condition and operation on the day the plaintiff Joseph Pridgen was injured. The second summary appearing in the paragraphs immediately above deals with events which occurred after Joseph Pridgen had gone through the escape hatch of the elevator car and had reached the roof of the car.

.

4. *The Direction of Verdicts for the Authority on Counts Alleging Wilful, Wanton or Reckless Conduct.* The plaintiffs' actions against the authority are based in part on their claim that even if Joseph Pridgen was a trespasser, or was guilty of negligence which contributed to his own injury, the authority is nevertheless liable under the rule clearly stated by Chief Justice Knowlton in *Aiken* v. *Holyoke St. Ry.* 184 Mass. 269, 271 (1903), in the following language: "[O]ne who wilfully and wantonly, in reckless disregard of the rights of others, by a positive act or careless omission exposes another to death or grave bodily injury, is liable for the consequences, even if the other was guilty of negligence or other fault in connection with the causes which led to the injury." This rule has since been stated in the same or substantially similar language in numerous opinions of this court, including *Romana* v.: *Boston Elev. Ry.* 218 Mass. 76, 82-83 (1914), and *Baines* v. *Collins,* 310 Mass. 523, 526 (1942). For an exhaustive discussion of the rule as involved in the crime of involuntary manslaughter, see *Commonwealth* v. *Welansky,* 316 Mass. 383, 396-401 (1944), and the cases and authorities cited therein. Restatement: Torts, § 500. Restatement 2d: Torts, §§ 500-503 (1965); cf. *id.* § 336, comment e, and Special Note.

The rule of liability for "wilful, wanton or reckless conduct" has been so frequently stated and discussed that nothing would be gained by discussing it further in this opinion. The problem confronting the court in most of the cases in which the benefit of the rule is claimed is not what the rule is, but rather whether the plaintiff's evidence is sufficient to support a finding that the defendant's conduct was in fact "wilful, wanton or reckless." This case is no exception in that regard.

We hold that the evidence was not sufficient, on any version or aspect thereof, to warrant a finding of wilful, wanton or reckless conduct on the part of the authority. There was therefore no error in directing verdicts for the authority on the counts alleging such conduct by it.

5. *The Entry of Verdicts under Leave Reserved for the*

*Authority on the Counts Alleging Negligence.* To test the correctness of the entry of verdicts for the authority under leave reserved on the counts alleging negligence we ask "whether the evidence in its aspect most favorable to the plaintiff[s] could rightly be found to support the contentions essential to the maintenance of . . . [their] cause of action." *Holton* v. *Shepard,* 291 Mass. 513, 515 (1935). This is the same test which is applied in the case of a motion for a directed verdict. *Petrangelo* v. *Pollard,* 356 Mass. 696, 697 (1970). However, in this case, before considering the legal sufficiency of the evidence we must give some attention to "the contentions essential to the maintenance" of the plaintiffs' cause of action.

The judge first instructed the jury "that as a matter of law, the position of the boy Joseph, the moment he got on top of the roof of the car, climbing up through the escape hatch, is that of a trespasser, and that the only duty owed to him at that point by the defendant, was the duty to refrain from wilful, wanton or reckless conduct that might cause an injury to him." However, the judge clearly did not intend his instruction quoted above to be dispositive of the negligence counts since he permitted them to go to the jury. On those counts he instructed the jury in effect that once Joseph fell off the elevator car and was trapped and helpless in the elevator shaft, the duty owed him by the authority was to exercise reasonable care to avoid further injury to him.[2]

The correctness of the judge's initial instruction to the jury that the status of the plaintiff Joseph Pridgen as he went through the escape hatch and got on the roof of the elevator car was that of a trespasser is too obvious to require any discussion in support thereof. *Mikaelian* v. *Palaza,* 300

---

[2]The judge instructed the jury: "Now, you are entitled to consider this question. What were the duties of Carney as an employee of the Boston Housing Authority, if you find that he was in the hallway at that particular time. If you find that he was there and Mrs. Pridgen did ask him for help, then you should consider what could he have done as a reasonably prudent man to help the boy at that point? . . . [I]f he is now in a position of danger and helpless, you're entitled to ask what should a reasonably prudent man in the position of Carney, have done at that point . . . with respect to helping the boy, considering the position of the boy as it then existed. . . . Now, once the boy was trapped . . . so that he could not . . . do anything more . . . the defendant owed him a duty of reasonable care not to take any action which would further aggravate his injuries in any way."

Mass. 354, 355-356 (1938). See *Mounsey* v. *Ellard,* 363 Mass. 693,707, fn. 7 (1973). The judge's later instruction on the nature and extent of the authority's duty toward Joseph after he slipped off the car roof and became trapped was in accord with the rule of many other jurisdictions that although an owner or occupier of land owes a trespasser only the duty to refrain from wilful, wanton or reckless conduct, where a trespasser is in a position of peril or in a helpless situation and his presence becomes known, the owner then has a duty to use reasonable care to avoid injuring him, or, as sometimes stated, a duty of reasonable care in the circumstances. See, e.g., *Clawson* v. *Stockton Golf & Country Club,* 220 Cal. App. 2d 886, 900 (1963); *Kuharski* v. *Somers Motor Lines, Inc.* 132 Conn. 269, 272-273 (1945); *Byers* v. *Gunn,* 81 So. 2d 723, 725 (Fla. 1955); *Briney* v. *Illinois Cent. R.R.* 401 Ill. 181, 186-187 (1948); *Mann* v. *Des Moines Ry.* 232 Iowa 1049, 1057-1058 (1942); *Lyshak* v. *Detroit,* 351 Mich. 230, 250-251 (1958); *Frederick* v. *Philadelphia Rapid Transit Co.* 337 Pa. 136, 139-142 (1940); *Lavallee* v. *Pratt,* 122 Vt. 90, 93-95 (1960). See, also, Prosser, Torts (4th ed. 1971) § 66, pp. 427-430; 65 C. J. S., Negligence, § 63(16) (1966); Restatement 2d: Torts, § 336, comment b (1965).

Very few of our cases have involved a trespassing plaintiff in a position of peril attempting to recover in negligence, and we have never adopted a rule similar to that followed by other jurisdictions in the cases cited above. See *Lovett* v. *Salem & So. Danvers R.R.* 9 Allen 557, 562-563 (1865); *Yancey* v. *Boston Elev. Ry.* 205 Mass. 162, 169-170 (1910); *Edgerton* v. *H. P. Welch Co.* 321 Mass. 603, 612-613 (1947). Rather, we have most recently approached the problem by asking whether the plaintiff's wrongful trespass is a condition or the proximate cause of his injury. If the former, he is permitted to recover in negligence against the defendant; if the latter, he is barred from recovery. *Scott* v. *Boston Elev. Ry.* 318 Mass. 31, 33-34 (1945).

This distinction between "condition" and "proximate cause" is one which we have used frequently in cases where the plaintiff is guilty of contributory negligence or of

violating an ordinance or statute and the question is whether he can nevertheless recover in negligence because the defendant is guilty of a later negligence. See, e.g., *Black* v. *New York, N. H. & H. R.R.* 193 Mass. 448, 451 (1907); *Query* v. *Howe,* 273 Mass. 92, 96 (1930).

In *Scott* v. *Boston Elev. Ry., supra,* the distinction was applied to a trespassing plaintiff, a minor, who had jumped onto and was riding on the outside of the defendant's bus. He then jumped off, bumped into a car, fell down in back of the wheels of the bus, and was injured when the bus ran over him. This court upheld the direction of verdicts for the defendant on counts of negligence and wanton and reckless conduct, stating that on the negligence count, the only count on appeal, "[t]he plaintiffs rightly do not contend that while clinging to the outside of the bus the [minor] plaintiff was not a trespasser. . . . [citation omitted]. The jury would have been obliged to find that the injuries sustained by the plaintiff were closely bound up with the trespass, and that the jumping by the plaintiff from the bus, his bumping into an automobile and his falling in back of the wheels of the bus occurred almost at once . . .. In these circumstances we are of opinion that the trespass by the plaintiff was 'so intimately connected with his injury as a proximate cause that as matter of law he is barred from recovery on the first count based upon negligence.' *Query* v. *Howe,* 273 Mass. 92, 96 [1930]." 318 Mass. at 33-34.

In instructing the jury in the present case, the judge did not make Joseph Pridgen's right to recover turn on whether there was an "intimate connection" between his trespass and his injury, but rather on whether the authority exercised reasonable care toward him once it became aware that he was trapped in the elevator shaft, regardless of his initial status as a trespasser. We believe the judge's approach and instructions were correct. It is a more sound and useful approach than the "intimate connection" test when applied to the facts of the present case where the plaintiff was not injured while committing his initial trespass, but was allegedly injured by reason of what the property owner either did or failed to do

after learning of both the trespass and the fact that the trespasser was helplessly trapped.

The standard of care required of a defendant in such a case warrants further discussion. As noted, many courts in other jurisdictions have described this standard in terms of a duty of reasonable care to avoid injuring the trespassing plaintiff whose trapped position is known. *Kuharski* v. *Somers Motor Lines, Inc.* 132 Conn. 269, 272-273 (1945). *Briney* v. *Illinois Cent. R.R.* 401 Ill. 181, 186-187 (1948). *Mann* v. *Des Moines Ry.* 232 Iowa 1049, 1057-1058 (1942). *Frederick* v. *Philadelphia Rapid Transit Co.* 337 Pa. 136, 139-142 (1940). Cf. *Averch* v. *Johnston,* 90 Col. 321 (1932) (landowner or occupier owes to trespasser whose presence is known a duty of reasonable care not to injure by any affirmative act or force); *Day* v. *Mayberry,* 421 S. W. 2d 34 (Ct. App. Mo. 1967). The statement of the rule in terms of a duty to exercise reasonable care "to avoid injuring" a trapped trespasser is unfortunate we think. It has caused numerous cases to be decided on the basis of the traditional common law distinction between acts of "misfeasance" and "nonfeasance," with resulting liability for acting negligently but not for failing or refusing to act at all, with reference to a person who is in peril and helpless. See *Griswold* v. *Boston & Maine R.R.* 183 Mass. 434 (1903);[3] *Osterlind* v. *Hill,* 263 Mass. 73, 76 (1928). See also Restatement 2d: Torts, § 314,[4] comments c-f (1965), and Prosser, Torts (4th ed. 1971) § 56, pp. 338-

---

[3]In this case, which contains a clear expression of the traditional distinction, the court, in disposing of the plaintiff's claim of negligence against the railroad said, at 437:

"But there is another view of this case which strikes at the foundation of the plaintiff's claim. Her counsel has referred us to no case which supports the proposition that if a person is injured through no fault of a railroad company, the latter owes a legal duty to the person injured to assist him. There is of course a moral duty, but in performing that duty, the company is not liable if one of its servants does not use his best judgment in affording the necessary assistance. . . . If . . . [a duty of common humanity were] law, no humane or gratuitous act could be done without subjecting the doer of it to an action on the ground that the defendant ought to have acted more quickly or with more judgment. It is a doctrine which would allow an action against a good Samaritan and let a priest and a Levite go free."

[4]This section states the rule that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."

339.[5] Despite language criticising this distinction,[6] the cited authorities indicate that it remains the general rule and that a stricter duty of the affirmative action is owed to one in peril only where a special relation exists between the parties, such as common carrier and passenger, innkeeper and guest, parent and child, or employer and employee. Restatement 2d: Torts, § 314A (1965). Prosser, *supra,* § 56, at 340-343. See Rudolph, The Duty to Act: A Proposed Rule, 44 Neb. L. Rev. 499, 503-507, 509 (1965).

In the context of the relationship between an owner or occupier (owner) of property and a trapped, imperiled and helpless trespasser thereon, we reject any rule which would exempt the owner from liability if he knowingly refrains from taking reasonable action which he is in a position to take and which would prevent injury or further injury to the

---

[5]Dean Prosser, after stating the common law rule imposing liability for misfeasance but not for nonfeasance, says: "The reason for the distinction may be said to lie in the fact that by 'misfeasance' the defendant has created a new risk of harm to the plaintiff, while by 'nonfeasance' he has at least made his situation no worse, and has merely failed to benefit . . . [the injured person] by interfering in his affairs. The highly individualistic philosophy of the older common law had no great difficulty in working out restraints upon the commission of affirmative acts of harm, but shrank from converting the courts into an agency for forcing men to help one another [footnotes omitted]."

[6]An example of such criticism is the following language from Prosser, *supra,* at 340-341:
  *"Duty to Aid One in Peril.* Because of this reluctance to countenance 'nonfeasance' as a basis of liability, the law has persistently refused to recognize the moral obligation of common decency and common humanity, to come to the aid of another human being who is in danger, even though the outcome is to cost him his life. Some of the decisions have been shocking in the extreme. The expert swimmer, with a boat and a rope at hand, who sees another drowning before his eyes, is not required to do anything at all about it, but may sit on the dock, smoke his cigarette, and watch the man drown. A physician is under no duty to answer the call of one who is dying and might be saved, nor is anyone required to play the part of Florence Nightingale and bind up the wounds of a stranger who is bleeding to death, or to prevent a neighbor's child from hammering on a dangerous explosive, or to remove a stone from the highway where it is a menace to traffic, or a train from a place where it blocks a fire engine on its way to save a house, or even to cry a warning to one who is walking into the jaws of a dangerous machine. The remedy in such cases is left to the 'higher law' and the 'voice of conscience,' which, in a wicked world, would seem to be singularly ineffective either to prevent the harm or to compensate the victim.
  "Such decisions are revolting to any moral sense. They have been denounced with vigor by legal writers. Thus far the difficulties of setting any standards of unselfish service to fellow men, and of making any workable rule to cover possible situations where fifty people might fail to rescue one, has limited any tendency to depart from the rule to cases where some special relation between the parties has afforded a justification for the creation of a duty, without any question of setting up a rule of universal application [footnotes omitted]."

trespasser. It should not be, it cannot be, and surely it is not now the law of this Commonwealth that the owner in such a situation is rewarded with immunity from liability as long as he ignores the plight of the trapped trespasser and takes no affirmative action to help him. Thus, in the case before us it is unthinkable to have a rule which would hold the authority liable if one of its employees, acting in the course of his employment, pushed the "go" button on the elevator although he knew Joseph Pridgen was trapped in the elevator shaft, but would not hold it liable if, being reasonably able to do so, the employee knowingly failed or refused to turn off the switch to the electrical power for the same elevator.

This is not a case of an intruder who is cut during the act of pushing his fist through the glass in a door which the owner has no duty to open for him; rather, we are dealing with one who is injured after his original trespass is effectively frustrated by virtual physical entrapment in a position of peril. We hold that as to the latter trespasser the owner owes a duty to exercise reasonable care to prevent injury or further injury to him, including, if necessary, the duty to take reasonable affirmative action. We reject any notion that this is a duty which can never be violated by nonfeasance. The owner in such a situation is required to act if, in the same circumstances, an ordinary and reasonably prudent person would have acted, and, in doing so, he must exercise the degree and standard of care which would have been exercised by an ordinary and reasonably prudent person in those circumstances.[7]

The rule which we have stated is in part a recognition by the law of the ever changing concepts of each individual's rights and duties in relation to all other members of our society, and it reflects current standards of concern for the personal safety and well being of each individual. It is also consistent with a number of judicial precedents, both in this Commonwealth and elsewhere, indicating a trend toward the

[7]Cases such as *Griswold* v. *Boston & Maine R.R.* 183 Mass. 434, 437 (1903), and *Osterlind* v. *Hill,* 263 Mass. 73, 76 (1928), cited above, are thus no longer to be followed.

imposition of a single duty of reasonable care by owners or occupiers of premises to all persons coming thereon.

In the recent case of *Mounsey* v. *Ellard,* 363 Mass. 693, 707 (1973), this court stated that "we . . . create a common duty of reasonable care which the [owner or] occupier owes to all lawful visitors," and that such duty was expressly limited to visitors variously referred to in earlier decisions as either licensees or one of the many gradations of invitees. The court noted the difference between licensees and invitees on the one hand and trespassers on the other and said in a footnote, "Frankly, we are not persuaded as to the logic and reasoning in *Rowland* v. *Christian,* 69 Cal. 2d 108 [1968], in placing trespassers in the same legal status as licensees and invitees. The possible difference in classes of trespassers is miniscule compared to the others. These differences can be considered when they arise in future cases." 363 Mass. at 707, fn. 7.[8] See *Kermarec* v. *Compagnie Generale Transatlantique,* 358 U. S. 625, 631 (1959); *Smith* v. *Arbaugh's Restaurant, Inc.* 469 F. 2d 97 (D. C. Cir. 1972); Prosser, *supra,* § 56; and Restatement 2d: Torts, §§ 336, 338 (1965).[9]

---

[8]In the case of *Mounsey* v. *Ellard, supra,* the present writer, by a separate opinion, concurred in the result but disagreed with the use of that case "as the vehicle for the promulgation of such a broad new rule of law." The concurring opinion of Kaplan, J., at p. 717 suggested that "footnote 7 . . . seems unfaithful to the rest of the opinion . . . [and that it] tends to perpetuate . . . the kind of tradition-bound and mistaken analysis that I had supposed the court was aiming to correct."

[9]These sections read as follows:

§ 336: "A possessor of land who knows or has reason to know of the presence of another who is trespassing on the land is subject to liability for physical harm thereafter caused to the trespasser by the possessor's failure to carry on his activities upon the land with reasonable care for the trespasser's safety."

§ 338: "A possessor of land who is in immediate control of a force, and knows or has reason to know of the presence of trespassers in dangerous proximity to it, is subject to liability for physical harm thereby caused to them by his failure to exercise reasonable care (a) so to control the force as to prevent it from doing harm to them, or (b) to give a warning which is reasonably adequate to enable them to protect themselves."

§ 338, comment b, reads: "The rule stated in this Section applies to any moving force over which the possessor is in immediate control, in so far as the force is connected with a condition created or maintained by him. This is true irrespective of whether the particular force is actually set in motion by him, by a force of nature, or by a third party with or without his consent."

Illustration 1, under § 338, comment b, reads: "A sees B, a trespasser, upon a part of A's land previously free of trespassers, about to come in contact with moving machinery which is maintained by him upon his land. A could shut off the power but fails to do so. A is subject to liability to B, irrespective of whether the machinery was set in motion by A or his servant or by a mischievous trespasser."

In deciding the *Mounsey* case, *supra,* we deferred until an appropriate "future case" the decision whether the "common duty of reasonable care which the [owner or] occupier owes to all lawful visitors" should apply to certain classes of trespassers. We now hold that the same common duty of reasonable care is owed by an owner to a trespasser who has become helplessly trapped on the premises to the owner's knowledge.

We now turn to the question whether the evidence was sufficient, if believed, to warrant the jury in finding that the authority violated the "common duty of reasonable care" which it owed to Joseph Pridgen. Stated differently, the question is whether the evidence was sufficient, if believed, to warrant the jury in finding that the authority was negligent. To reach the answer we must ask two subsidiary questions: (1) whether the evidence permitted the jury to find that William Carney was negligent; and (2) whether it permitted the jury to find that Carney's negligent acts, if any, occurred while he was acting within the scope of his employment, rendering the authority liable under the principle of respondeat superior. We hold that the answer is affirmative as to both subsidiary questions and therefore also affirmative as to the principal question.

The jury could have found the following on the basis of the evidence most favorable to the plaintiffs (*Kelly* v. *Railway Exp. Agency, Inc.* 315 Mass. 301, 302 [1943]). Carney was present in the hallway of 20 Bickford Street at the time Joseph Pridgen was trapped in the elevator shaft. Mrs. Pridgen asked his help to rescue her son and specifically asked him to turn off "the lights." He did nothing then, but when asked by a police officer if he knew where to turn off "the lights" he answered that he did and headed in the direction necessary to turn the electrical power off. The police officer arrived and spoke to Carney after the elevator had moved and had injured Joseph Pridgen. From this the jury could reasonably infer that: (1) Carney was aware that Joseph Pridgen was trapped in the elevator shaft; (2) he understood Mrs. Pridgen's request to "shut off the lights"

to mean the electrical power running the elevator; (3) he did know how to cut off such power and was able to do so; and (4) he could have done so before the policeman arrived and before the elevator moved and injured Joseph. If the jury drew such permissible inferences they would be warranted in finding that in the circumstances Carney had not satisfied the standard of reasonable care required of him by reason of his failure either to turn off the building's electrical power or to take other steps toward Joseph's rescue when he knew that the boy was trapped somewhere inside the elevator shaft.

On the question whether Carney was acting within the scope of his employment when present in the hallway of 20 Bickford Street at the time of the accident, the jury could have found the following. Carney worked as a janitor or maintenance man at the Bromley Heath housing project at the time of Joseph Pridgen's accident. For some time before the accident, Mrs. Pridgen had seen him every day working around the project, and he was the person who changed light bulbs in her building. At the time of the accident he was in the hallway at 20 Bickford Street, during his regular working hours, "working with a broom, sweeping up." When asked by the police officer if he worked there he answered, "yes." Carney himself testified that he knew Mrs. Pridgen because he took care of her building. From this evidence the jury could reasonably infer that on the date of the accident Carney was in the authority's building at 20 Bickford Street in his capacity as the defendant's servant (compare *Heywood* v. *Ogasapian,* 224 Mass. 203 [1916]; *Breen* v. *Dedham Water Co.* 241 Mass. 217 [1922]; *Altoonian* v. *Muldonian,* 277 Mass. 53 [1931]; *Rogers* v. *United Mkts. Inc.* 310 Mass. 829 [1941]), and that in the emergency situation created by Joseph's fall, he would have been acting within the scope of his authority and responsibility in turning off the building's electrical power, although his ordinary tasks as a janitor did not include having charge over the electrical system. See *McDonough* v. *Vozzela,* 247 Mass. 552 (1924).[10]

---

[10]Admittedly some of our cases have described the scope of employment of an employee such as Carney in more restrictive terms. See e.g., *Lanstein* v. *Acme White*

In conclusion, we hold that it was error for the trial judge to enter the verdicts for the authority under leave reserved, and that the verdicts returned by the jury for the plaintiffs should have been permitted to stand.

6. *Request for Additur.* The plaintiffs argue that if we should determine that they were entitled to the verdicts rendered in their favor by the jury, we should grant an additur to the sums the jury awarded as damages. Questions concerning inadequate or excessive damages are initially within the discretion of the trial judge and should ordinarily be raised by bringing a motion for a new trial, "stating the reasons relied upon in its support." G. L. c. 231, § 127, as amended. *Bartley* v. *Phillips,* 317 Mass. 35, 41-44 (1944), and cases cited. The plaintiffs' motion for a new trial did not raise the issue of inadequate damages. We are therefore not required to consider this issue on this appeal. *Parker* v. *Lewis J. Bird Co.* 221 Mass. 422, 426 (1915).

7. *Absence of Express Assent of Jury to Entry of Verdicts under Leave Reserved.* When the jury returned verdicts for the plaintiffs against the authority on the counts charging negligence, the judge ordered that they be entered under leave reserved as provided in G. L. c. 231, § 120, but he did not expressly request or obtain the assent of the jury to do so. See *Goetze* v. *Dominick,* 246 Mass. 310, 311 (1923). The plaintiffs excepted and argue in their brief that such failure to obtain the jury's assent violated their State and Federal constitutional rights to a trial by jury. These exceptions have become immaterial in view of our holding that it was error to enter verdicts for the authority under leave reserved on these counts. In this connection it is appropriate to note that effective on July 1, 1974, the present practice of taking verdicts under leave reserved, with the assent of the jury, will be superseded by the new practice prescribed by the following

---

*Lead & Color Works,* 285 Mass. 328, 331 (1934); *Cadogan* v. *Boston Consol. Gas Co.* 290 Mass. 496, 500-501 (1935); *Barrett* v. *Wood Realty Inc.* 334 Mass. 370, 375 (1956); *Stewart* v. *Worcester Gas Light Co.* 341 Mass. 425, 436-437 (1960). We do not think the narrower view of an employee's scope of authority reflected in these cases represents the current state of the law in this Commonwealth and we are not disposed to follow it.

provision of Mass. R. Civ. P., Rule 50 (b): "Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict . . .." By St. 1973, c. 1114, § 203, G. L. c. 231, § 120, has been repealed effective July 1, 1974. See c. 1114, § 351.

8. *Additional Exceptions of Plaintiffs.* The plaintiffs saved numerous exceptions in addition to those we have discussed above. Many of them are treated as waived for failure to argue them in their brief. S.J.C. Rule 1:13, 351 Mass. 738 (1967). *Lolos* v. *Berlin,* 338 Mass. 10, 13-14 (1958). *Gelinas* v. *New England Power Co.* 359 Mass. 119, 126-127 (1971). We have examined all of the additional exceptions which were argued in the brief and hold that they are without merit. In any event, they would not affect the result which we have reached concerning the verdicts for the plaintiffs against the authority.

9. *Variance Between Plaintiffs' Specifications and Proof.* The authority argues in its brief that the plaintiffs are not entitled to recover on their counts alleging negligence because of a claimed fatal variance between their specifications and their proof of the authority's negligence. Examination of the record shows that, in response to the authority's motion, the plaintiffs specified that the negligence consisted of a failure to make timely and periodic inspections of the elevator in question, failure to prevent use of the elevator by minors, and failure to insure the repair and safeguard of a hatch cover.

The authority's motion for a directed verdict was based "upon all the evidence and the pleadings." It did not mention the specifications and did not allege a variance between the pleadings and the proof. In arguing the motion counsel

for the authority did not mention or rely on any such alleged variance. The judge ultimately submitted the case to the jury on the issue whether the authority was negligent by reason of what its employee, Carney, did or failed to do after Joseph Pridgen became trapped in the elevator shaft. The authority knew and clearly understood the theory on which the judge submitted the negligence counts against it to the jury. It knew of the prior specifications by the plaintiffs. Yet it made no objection and took no exception to the judge's instructions to the jury based on any alleged variance between the specifications and such theory.

The case was fully and fairly tried on the issue whether the authority was negligent by reason of what its employee, Carney, did or failed to do after Joseph Pridgen became trapped. It is not now appropriate for the authority to argue an alleged fatal variance before this court. *Mitchell* v. *Lonergan,* 285 Mass. 266, 271 (1934). Rather, it is now appropriate to permit the plaintiffs to amend their declaration to conform their counts alleging negligence by the authority to their proof thereof. Under G. L. c. 231, § 51, "[t]he court may, at any time before final judgment, . . . allow amendments . . . in matter of form or substance in any process, pleading or proceeding, which may enable the plaintiff to sustain the action for the cause for which it was intended to be brought." In some cases we have authorized the amendments to be made in the trial court. *Payne* v. *R. H. White Co.* 314 Mass. 63, 67 (1943). *Coburn* v. *Moore,* 320 Mass. 116, 124 (1946). *Carson* v. *Brady,* 329 Mass. 36, 41 (1952). See *Sandler* v. *Elliott,* 335 Mass. 576, 589 (1957), and cases cited. In others we have allowed them to be made in this court under the provisions of G. L. c. 231, § 125, giving the court "all the powers of amendment of the court below" in cases before us for appellate review. *Mitchell* v. *Lonergan,* 285 Mass. 266, 271 (1934). *New England Foundation Co. Inc.* v. *Elliott & Watrous, Inc.* 306 Mass. 177, 181, 183 (1940). *Brogie* v. *Vogel,* 348 Mass. 619, 622 (1965). Cf. *Motta* v. *Mello,* 338 Mass. 170, 174 (1958).

10. *Disposition of Plaintiffs' Exceptions.* The exceptions

of the plaintiffs are hereby disposed of as follows:

(a) The exceptions to the allowance of the motions for directed verdicts for the defendants on the following counts are overruled: counts 2 and 7 against Westinghouse alleging negligence; counts 3 and 8 against Consolidated alleging negligence; counts 4 and 9 against the authority alleging wilful, wanton or reckless conduct; and counts 5 and 10 against Consolidated alleging wilful, wanton or reckless conduct.

(b) If, within twenty days of this opinion, the plaintiffs file in this court motions to amend their counts 1 and 6 to conform their allegations of negligence on the part of the authority to the proof thereof presented at the trial, such motions will be allowed and the plaintiffs' exceptions to the entry of verdicts for the authority on those counts by the Superior Court acting under leave reserved will be sustained. Thereupon judgment is to enter for the plaintiffs on those counts in accordance with the verdicts of the jury.

(c) All other exceptions are overruled or treated as waived.

*So ordered.*