Lenk, J.
Briefly, this case arises out of the attempted adoption of minor plaintiffs Joan and Paul Doe and their older brother, defaulted third-party defendant George Doe, by John and Jane Doe (collectively “the plaintiffs”). Joan, Paul and George were placed with John and Jane Doe by an adoption agency, XYZ Services, Inc. At some time after the placement of the Doe children with John and Jane Doe, it is alleged that George Doe molested his younger siblings. John and Jane Doe eventually adopted the younger Doe children, Joan and Paul, but did not adopt George.
In this case, the plaintiffs are suing XYZ Services, Inc. and its employees, Mary Roe, AJR and JB (collectively “the Adoption Agency”). The plaintiffs allege that the Adoption Agency was negligent in placing the three Doe siblings together in a new home because the risk of harm to the younger siblings was foreseeable.
The Adoption Agency has brought counterclaims and cross-claims, including cross-claims against KH (“the Therapist”), a psychiatry intern who treated George, and GHI, Inc. (“the Hospital”), the hospital where the Therapist worked, alleging that they breached their duty to warn the Adoption Agency of the danger of placing the Doe siblings together, resulting in harm to the plaintiffs.
Third-party defendants, the Therapist and the Hospital, have moved for summary judgment on all claims against them pursuant to Mass.R.Civ.P. 56. This motion is opposed by the Adoption Agency.
BACKGROUND
The following facts are undisputed, except where noted. In the summer of 1985, defaulted third-party defendant George Doe and his younger siblings, plaintiffs Joan and Paul Doe (“George,” “Joan” and “Paul” or collectively “the children”) were evaluated for sexual abuse. Earlier that year, George had disclosed that he and Joan and Paul were being abused by their biological father/step-grandfather. Two employees of third-party defendant ABC Inc., LB and PC,[1] evaluated the children. The Department of Social Services (“DSS”) removed the children from the home, and they were residing with their mother in a shelter at the time of the evaluations. After the evaluations, George was placed in one foster home and Joan and Paul were placed together in another foster home. DSS referred the children for therapy.
In September of 1985, George began therapy with the Therapist at the Hospital. George was known to have been extensively sexually abused and afflicted with Attention Deficit Disorder (“ADD”). The evaluations prepared by LB were made available to the Hospital. At the time, the Therapist had a Master’s degree in Psychology, was preparing for her Doctorate, and was serving as a clinical fellow in psychology in the department of psychiatry. The Therapist was awarded her Doctorate in 1986. Neither the Therapist, nor her supervisor, had any specialized experience or training in treating sexually abused children. Even today, the Therapist concedes that she does not consider herself competent to treat a child presenting George’s problems. The Therapist’s March 3, 1986 evaluation indicates that her supervisor did not think the Therapist was adequately prepared to work with children coming from multi-problem families.
At the time of her treatment of George, the Therapist knew that he and his siblings had been sexually abused and knew that children who have been sexually abused as children may become abusers and/or become revictimized. The Therapist also knew that George lived in a foster home with other minor children, some of whom were close to his age of nine years, and that he regularly visited his siblings. The Therapist was trained at the Hospital to make reports “if there was some imminent harm that a child was going to perpetrate on somebody else or on themselves . . .” (Ex. 3, Day 2, pp. 44, 141-43.) The Therapist did not make any such reports to her superiors at the Hospital, to DSS, to George’s foster mother, or to his teachers.
From September 1985 to July 1986, the Therapist conducted thirty-five one hour psychotherapy sessions with George. According to the Therapist, the primary goal of George’s treatment ‘"was to provide a corrective emotional experience for George, one in which he felt mirrored and validated by a reliable, empathetic adult (the Therapist) and able to begin developing ego skills." As a result of additional evaluations by specialists at the Neurology clinic at the Hospital, George was placed on Ritalin. George’s evaluation at the Hospital continued and the Therapist referred George to BS for neuropsychological assessment. BS recommended interventions to assist George in functioning well in school. She noted that “George’s *586 affective issues must be addressed by continued therapeutic intervention and placement in a positive, yet structured, home.”
There is no indication in the Therapist’s notes that she discussed George’s history of sexual abuse or the potential implications of that history at any time during her therapy with him. The Therapist does not recall asking George directly or indirectly whether he was touching anyone or being touched by anyone in a sexual manner, or discussing the difference between “good touching” and “bad touching.” George did not indicate that he was abusing his siblings or others or contemplating doing so. The Therapist restricted her inquiry regarding George’s sexual abuse history to “looking for any verbal or non-verbal expression of anything with a sort of sexual charge to it” and remaining in “frequent contact with his DSS worker as well as his foster mother and his school teachers." The Therapist did not examine the Hospital’s record on George’s sister, Joan.
DSS had referred Joan and Paul to therapy as well. Paul received therapy from SN of ABC, Inc. and Joan received therapy from AP of ABC, Inc. SN remembers no contact with the Hospital or the Therapist regarding George during this time. AP remembers only one telephone conversation, which focused on the biological mother surrendering custody of the children. The Therapist also had contact with the DSS worker assigned to the case. The DSS worker understood her role to be to “see how well the [DSS] client gets along with the therapist” and to encourage the client to ask for a change of therapist if the relationship was not satisfactory. DSS retained responsibility for permanency planning for the children and held meetings to attempt to coordinate placement planning with the therapeutic component of the child’s case.
In March 1986, the Therapist wrote a six month summary of George’s therapy in which she noted that he was making progress and appeared to have a good prognosis. She based her assessment on his progress in treatment and in school, and on his relationship to his foster mother. The Therapist noted that George’s aggressive fantasies had lessened and that he was beginning to express his anger directly.
In July 1986, the Therapist’s internship with the Hospital ended and she concluded her treatment of George. The Therapist wrote a closing summary in which she recommended continuing twice weekly therapy sessions for George. The Therapist noted that in her work with George she “touched upon” his wish to make choices regarding future placement, did not focus on placement issues and never discussed whether he would be placed with his siblings. Rather, George’s therapy “focused on containing the affect and helping [George] feel more in control of thése impulses rather than exploration of fantasy ... we also focused on differentiating fantasy from reality, identifying self/boundaries and developing ego strengths with the goal of shaping more adaptive responses to internal affect.” The Therapist did not comment on whether George should be placed with his siblings for adoption. The Therapist forwarded a copy of her summary to the DSS worker assigned to the case. The Therapist was aware that George’s biological mother had surrendered the children for adoption, but it was her understanding that George would continue to live in the same foster home and would attend specialized summer camp. It is disputed whether the Therapist was aware of any plan to reunite George with his siblings. She was, however, well aware of the involvement of DSS in the case of George and his siblings and knew that her reports would be read by the DSS worker assigned to the case. The Therapist remained in the Boston area for another year and was available for consultation by any of George’s subsequent therapists.
In June 1986, DSS decided to place George, Paul and Joan for adoption and referred their case to XYZ Services, Inc. No one at DSS or XYZ Services, Inc. asked the Therapist or the Hospital whether George was a suitable candidate for adoption. XYZ Services, Inc. decided to adhere to the DSS permanency plan of placement for adoption. Medical records from the Neurology Clinic at the Hospital indicate that this decision was made sometime between November 4, 1986 and January 7, 1987. XYZ Services, Inc. assigned Mary Roe, an adoption worker, to the case of George, Paul and Joan. Mary Roe had the Therapist’s summaries on file, but neither she nor anyone at XYZ Services, Inc. made any contact with the Therapist. DSS was actively involved in the case until October 1986, but made no contact with the Therapist.
In September 1986, George was evaluated by two other doctors in order to “clarify diagnosis, review his psychopharmacological status, and to assist with treatment program recommendations.” One of these doctors referenced the Therapist’s summary when she evaluated George, and recommended that he be placed in a residential treatment center. She spoke with George about his therapy at the Hospital. George told this doctor that he had liked going to therapy but that he had never spoken with his “counselor” about “all the stuff that had happened.” The doctor strongly recommended that George be placed in a residential program.
In October 1986, the DSS worker assigned to the case initiated a Referral for Group Care on behalf of George. In this Referral, she states: “[the Therapist] has stated to this worker that she feels [George] is in need of a residential placement where he will receive the 24 hour professional help he needs once he begins to deal with the issues of physical, sexual, emotional abuse, the loss of his mother, and the separation from his siblings.” The DSS worker, her supervisor and Maiy Roe of XYZ Services, Inc. signed this Referral. Nonetheless, sometime between November 1986 and *587 January 1987, the adoption team atXYZ Services, Inc. decided to place the children together for adoption. They began looking for an adoptive family in early 1987.
In June of 1987, Jane and John Doe (“the Does”) contacted XYZ Services, Inc. about the possibility of adopting the children. The children were placed in the Does’ home on September 4, 1987. George had been living apart from his siblings in a foster home until this time. Around April 1989, the Does allegedly discovered that George had sexually molested Joan and Paul while living in their home. On May 17, 1989, George was removed from the home.
DISCUSSION
I. Summary Judgment
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); accord, Kourouvacilis v. GeneralMotors Corp., 410 Mass. 706, 716 (1991).
“If the moving parly establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra, 404 Mass, at 17. “[W]hen a motion for summaiy judgment is made and properly supported, the nonmoving party may not simply rest on the pleadings, ‘but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.’ ” Correllas v. Viveiros, 410 Mass. 314, 317 (1991), quoting Mass.R.Civ.P. 56(e), 355 Mass. 824 (1974).
II. Negligence
In order for the Adoption Agency to prevail in its claim against the Therapist and the Hospital, it must show “(1) the existence of an act or omission, in violation of a (2) duty owed to [the Adoption Agency] by [the Therapist and the Hospital], (3) injury, and (4) a causal relationship between the breach of duty and the harm suffered.” A.L. v. Commonwealth, 402 Mass. 234, 239 (1988), quoting Dinsky v. Framingham, 386 Mass. 801, 804 (1982). A jury should be allowed to determine the issue of negligence if “anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." Ferragamo v. Massachusetts Bay Transportation Authority, 395 Mass. 581, 591 (1985), quoting Raunela v. Hertz Corp., 361 Mass. 341, 343 (1972).
The plaintiffs and Adoption Agency have advanced sufficient evidence to raise genuine issues of material fact regarding whether the Therapist and the Hospital breached a duty to the Adoption Agency and whether that breach proximately caused harm to the plaintiffs. While the Therapist recommended group care for George, she did not specify the reason for her recommendation: fear that George could sexually abuse his siblings if placed with them. Because the Therapist did not state that her recommendation was based at least in part on her concern about the safety of George’s siblings, the Adoption Agency was left to speculate about her reasons. Without the Therapist making that crucial link, her recommendation may have had less force. These are factual questions which are not appropriately resolved by summary judgment.
The court may rule, as a matter of law, that a duty does not exist. Carrier v. Riddell. Inc., 721 F.2d 867 (1st Cir. 1983). However, if the court finds that the existence of a duty is not precluded under law and that factual questions must be resolved before the possibility that a duty exists can be eliminated, those underlying factual questions must be sent to a factfinder. See, Mullins v. Pine Manor, 389 Mass. 47 (1983). Therefore, the court will examine whether there is sufficient evidence to submit to a factfinder the question of whether the Therapist and the Hospital had a duty to the Adoption Agency and the nature of any such duty.
A. Duty to Warn
The Therapist and the Hospital argue that they did not have a duty to the Adoption Agency because the Therapist did not have a therapist-patient relationship with the Adoption Agency. The Adoption Agency argues that a duty to a third party, the Adoption Agency, can flow from the Therapist’s therapist-patient relationship with George. The parties do not dispute that the Therapist had such a relationship with George. The question of whether a therapist can, in some circumstances, owe a duty to someone other than her patient is a novel issue in Massachusetts. To address it, the court looks at traditional sources of duty in Massachusetts law.
The scope of a defendant’s duty is established by the foreseeability that harm will result from the defendant’s negligent conduct. Dziokonski v. Babineau, 375 Mass. 555, 567 (1978). The Supreme Judicial Court explained the correlation between foreseeability, the relationship of the parties, and duty in *588 Irwin v. Ware, 392 Mass. 745, 756-57 (1984), as follows:[2]
While several different categories of such special relationships are recognized in the common law, they are based to a large extent on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so . . . It has been said that such foreseeability can be based on reasonable reliance by the plaintiff, impeding other persons who might seek to render aid, statutory duties, property ownership or some other basis. As the harm which safely may be considered foreseeable to the defendant changes with the evolving expectations of a maturing society, so change the “special relationships” upon which the common law will base tort liability for the failure to take affirmative action with reasonable care. See Mullins v. Pine Manor College, 389 Mass. 47, 51 (1983); Pridgen v. Boston Hous. Auth., [364 Mass. 696,] 711 [(1974)].
(Citations omitted.) Id. at 756. In Irwin, a municipality was held liable for the failure of its police officers to remove an intoxicated driver from the road after they stopped him for speeding. The driver was involved in an accident ten minutes later which resulted in the deaths of the plaintiffs decedents. Irwin, 392 Mass, at 764. The Court concluded that “[w]here the risk created by the negligence of a municipal employee is of immediate and foreseeable physical injury to persons who cannot reasonably protect themselves from it, a duty of care reasonably should be found.” Id. at 756.
The Supreme Judicial Court has permitted third parties to sue where the defendant’s special relationship with another gave rise to a duiy and a third party was harmed. In Page v. Frazier, 388 Mass. 55 (1983), the plaintiffs purchased a house and obtained a mortgage. The mortgagee bank hired a lawyer to certify legal title to the property. The lawyer erroneously certified legal title and was sued by the plaintiffs for negligent misrepresentation. Despite the lack of an attorney-client relationship between the lawyer and the plaintiffs the Court permitted the suit because it was foreseeable to the lawyer that the plaintiffs would rely on his services.[3]
The Therapist and the Hospital analogize the facts of this case to those in McNulty v. McDowell, 415 Mass. 369 (1993). In McNulty the plaintiffs mother had seen the defendant doctor for assistance with contraception. The doctor failed to test the mother for immunity to rubella and the mother later became pregnant. As a result, the plaintiff was born with congenital rubella syndrome. The Supreme Judicial Court held that the physician did not owe a duty to the child in that case, basing its holding on “the sparse contacts between Keri Ann’s mother and McDowell, and the fact that these contacts were made not in anticipation of pregnancy, but rather to avoid it.” McNulty, 415 Mass, at 373.
The facts in this case are very different from those in McNulty. George was entrusted to the care of the Therapist because of psychological symptoms he exhibited which all of the parties traced to his abusive family of origin. The Therapist knew that George had been sexually abused and met with him two to four times a month for nearly a year. No one disputes that a therapist-patient relationship existed between the Therapist and George. While the doctor in McNulty was unable to foresee the birth of the plaintiff in that case, much less the harm to the plaintiff, the Therapist knew that George visited his younger siblings regularly. She knew that the three children were in DSS custody and could foresee the possibility of their eventual placement together.
More analogous to the facts in this case are those in A.L. v. Commonwealth, 402 Mass. 234 (1988). In that case, a probation officer was sued by two boys who had been molested by the probationer the officer had been assigned to supervise. The probationer had been convicted, for a third time, of child molestation and was forbidden to teach or associate with young boys as a condition of his probation. In spite of this probation condition, the probationer secured employment as a teacher and molested two students, the plaintiffs in the case. The Supreme Judicial Court observed that the conditions of probation “were designed to protect young boys” and “[t]he probability that harm would result from allowing Darragh to teach or to associate with young boys was foreseeable both to the [sentencing] judge and to [the probation officer] who knew the terms of the probation and was familiar with Darragh’s criminal record.” A.L., 402 Mass, at 241. The Court considered the following factors in determining whether the probation officer had a duty to the plaintiffs in that case: (1) it was foreseeable to the probation officer that harm would result if the probationer was permitted to teach or associate with young boys, (2) the victims were members of an identifiable class whom the probation conditions were designed to protect, (3) the victims had no chance to protect themselves from the threatened harm. Id. at 240-41. The fact that the threatened harm, child sexual abuse, did not occur until nine months after the probationer was sentenced did not relieve the probation officer of his duty because “child sexual abuse is a continuing danger which persists over a [long] period.” Id. at 243. The Court held that the probation officer had an affirmative duty to make reasonable efforts to verify the probationer’s employment. Although the probationer averred that he was working as a salesman, the Court found that the probation officer had breached his duty by failing to require some verification of this assertion.
A jury could find that it was foreseeable to the Therapist, based on her interviews of George, that *589 there was a high risk that George might sexually abuse his younger siblings. She knew that there is a high risk that a child who was sexually abused may sexually abuse others. She knew that George had been sexually abused in his family of origin and that he visited his siblings on weekends. She knew that his placement in foster care was temporary and would be changed. The Therapist worked with George for almost a year, longer than any other therapist had worked with him since he had been removed from his family of origin. Because of this, a jury could infer that she should have known that her reports would be relied upon by XYZ Services, Inc., its employees, and DSS in deciding where to place George. If a jury were to conclude that the Therapist’s knowledge of these things made imminent harm to others foreseeable, it could find that the Therapist and the Hospital had a duty to notify others of the risks attendant in placing George with his siblings.
B. Voluntary Assumption of Duly
The Adoption Agency argues that the Therapist and the Hospital voluntarily assumed a duty to warn third parties about any risk of imminent harm to a client or created by a client. The doctrine of duly voluntarily assumed is set forth in Mullins v. Pine Manor, 389 Mass. 47, 53-54 (1983), as follows:
the mere fact that Pine Manor had voluntarily undertaken to render a service is not sufficient to impose a duty. It must also be shown that either (a) the failure to exercise due care increased the risk of harm, or (b) the harm is suffered because of the students’ reliance on the undertaking.
In this case, there is evidence that the Hospital had a policy of warning third parties if there was an imminent risk of harm. During her deposition, the Therapist testified, “[W]e were all very trained on when to make reports. If there was some imminent harm that a child was going to or that a client was going to perpetrate on somebody else or on themselves or if they were gravely disabled.” (Ex. 3, Day 2, p. 44.) She further testified, “(W]e received information on the specific steps to take should you get the knowledge of imminent risk." (Ex. 3, Day 2, p. 141.) Specifically, the Therapist testified that she was given written information by the Hospital including phone numbers to call if she feared imminent harm. (Ex. 3, Day 2, pp. 141-43.)
A jury could find that the Adoption Agency would not have placed the children together had the Therapist and the Hospital adequately warned them about the danger to the younger Doe children. Genuine issues of material fact exist as to whether the existence of the hospital policy amounts to a voluntary assumption of a duty to warn others of the imminent risk George presented to his siblings.
C. Conclusion
A jury could find that the Therapist and the Hospital had a duty to warn the Adoption Agency of the risks of placing the Doe children together and of the specific reason underlying that risk, either because harm was foreseeable to the Therapist or because the Therapist and the Hospital voluntarily assumed such a duly. The Adoption Agency has met its burden of presenting sufficient evidence to warrant either conclusion.[4] Because a juiy could base liability on either of these two theories, summary judgment for the Therapist and the Hospital must be denied.
ORDER
For the foregoing reasons, it is ORDERED that the motion for summary judgment of third-party defendants KH and GHI, Inc. be DENIED.

Initials are being used to shield the identities of individuals who are not parties to this case.

Irwin addressed the specific issues of municipal liability. However, its principles are also applicable to the facts in this case.

Nhe Court has not been willing to impose such a duly where the lawyer was under an independent and conflicting duty to a client. Spinner v. Nutt, 417 Mass. 549, 554 (1994) (lawyers did not owe duty to trust beneficiaries where lawyers had conflicting duty to their clients, the trustees).

The Adoption Agency advances a third theory upon which they contend a jury could find a duty. They argue for a duty on the part of the Therapist and the Hospital to diagnose and treat George correctly. Because a jury could base liability on either of the other two theories advanced by the Adoption Agency, the court need not reach this third argument.