A.L. *vs.* COMMONWEALTH
(and a companion case[1]).

Suffolk. October 7, 1987. — April 21, 1988.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Massachusetts Tort Claims Act. Governmental Immunity. Judicial Immunity. Negligence*, Municipal employee, School, Probation officer. *Municipal Corporations*, Liability for tort, Officers and agents, Duty to prevent harm. *Commonwealth*, Liability for tort, Officers and agents, Duty to prevent harm. *Probation Officer. Joint Tortfeasors*, Contribution.

On appeal of a case brought under the Massachusetts Tort Claims Act, G. L. c. 258, it was held that a probation officer supervising the probation of a convicted child molester owed a duty to plaintiffs, two young boys, beyond the duty he owed to the general public, where the conditions of probation imposed by the sentencing judge prohibiting the probationer from teaching or associating with young boys were designed to protect such boys, and where the probability that harm would result from such association was, in the circumstances, foreseeable. [239-241]

General Laws c. 276, § 85, which defines the duties of probation officers, does not limit a probation officer's duty to service of the court alone. [241-242]

The duties of a probation officer are defined by the specific instructions of the sentencing judge setting the conditions of probation to be enforced by the probation officer. [242]

The temporal immediacy of threatened harm to an identifiable class of persons occasioned by the negligent act of a public employee is to be considered in terms of the type of danger at issue, thus a threat of child sexual abuse is a continuing danger which may persist for a long period of time. [242-243]

In the circumstances, the parents of two young boys were held not to have been able to protect their children from sexual molestation by the boys' school teacher, nor were the children able to protect themselves, with the result that only the probation officer supervising the teacher, on probation after convictions of child sexual abuse with the specific condition that he refrain from teaching or associating with young boys, had the knowledge which could have protected the students from harm. [243]

---

[1] M.M. *vs.* Commonwealth.

A school principal's failure to respond to a parent's complaint about a teacher's sexually abusive behavior toward a male student was not an intervening superseding cause of injury to two male students who later were sexually abused by the teacher so as to excuse the Commonwealth's liability for a probation officer's negligent failure to verify the place of employment of the teacher, a convicted child molester, who was on probation with the specific condition that he not teach or associate with young boys. [244]

A probation officer had a duty to plaintiffs, two young boys, to make a reasonable effort to verify the place of employment of a certain probationer, a convicted child molester, to ascertain that he was not teaching or associating with young boys in violation of the specific conditions of his probation. [244]

The duty of a probation officer to make reasonable efforts to ascertain whether a probationer is complying with the terms and conditions of his probation is not a discretionary function so as to exempt the Commonwealth from liability for a probation officer's negligence in the conduct of that duty. [245-246]

No principles of judicial immunity applied to relieve the Commonwealth of liability for a probation officer's negligent failure to aid in the enforcement of conditions of probation imposed on a probationer convicted of child sexual abuse. [246-247]

Where the Commonwealth was directly liable under the Massachusetts Tort Claims Act, G. L. c. 258, § 2, to injured plaintiffs for the negligent acts of its employee, the city of Boston, which had settled a claim against it with the same plaintiffs in the same cause of action, was entitled to seek contribution from the Commonwealth as a joint tortfeasor for the amounts the city had paid the plaintiffs in excess of its pro rata share. [247-248]

No error appeared in a judge's finding that the amount of a settlement was reasonable in determining the amount of contribution due from one tortfeasor to another. [248]

HENNESSEY, J., concurring. [249-250]

NOLAN, J., dissenting, with whom LYNCH, J., joined, was of opinion that the case of *Irwin* v. *Ware,* 392 Mass. 745 (1985), is distinguishable from the present case both on its facts and statutory framework. [250-251]

O'CONNOR, J., dissenting, with whom LYNCH, J., joined, was of opinion that the present case was indistinguishable from *Ribeiro* v. *Granby,* 395 Mass. 608 (1985), *Nickerson* v. *Commonwealth,* 397 Mass. 476 (1986), and *Appleton* v. *Hudson,* 397 Mass. 812 (1986). [251-261]

CIVIL ACTIONS commenced in the Superior Court Department on November 13, 1980, and October 28, 1981.

The cases were consolidated for trial and were tried before *James P. Lynch, Jr., J.*

The Supreme Judicial Court granted a request for direct appellate review.

*Francis G. Chase*, Assistant Attorney General, for the Commonwealth.

*Jeffrey W. Kobrick (Frank S. Ganak* with him) for the plaintiffs.

ABRAMS, J. At trial in the Superior Court, a jury found the Commonwealth liable under the Massachusetts Tort Claims Act, G. L. c. 258, § 2 (1986 ed.), for the negligent failure of Lawrence Tierney, a probation officer, to verify the place of employment of Edward Darragh, a probationer in Tierney's charge. Darragh, a thrice-convicted child molester, was employed as a teacher in the Boston public schools in violation of the special conditions of his probation; during the term of his probation, Darragh sexually molested the plaintiffs, two of his students. The jury awarded A.L. and M.M. damages against the Commonwealth. The Commonwealth appeals. We granted the Commonwealth's application for direct appellate review. We affirm.

Edward Darragh was convicted on January 5, 1978, in the Waltham District Court on nine counts of indecent assault and battery on children under the age of fourteen and contributing to the delinquency of minors. Prior to this conviction, Darragh had been convicted twice in 1966 in the Malden and Woburn District Courts for indecent assault and battery on a child under the age of fourteen and for two counts of unnatural acts with young boys between the ages of ten and thirteen. For his 1978 conviction, Darragh received an eighteen-month suspended sentence. As specific conditions of his probation, the sentencing judge directed that Darragh (1) refrain from teaching; (2) refrain from associating with young boys; (3) continue psychotherapy during probation; and (4) sign any releases needed for dissemination of probation information.

Supervision of Darragh's probation was assigned to Probation Officer Lawrence Tierney. Tierney met with Darragh regularly, spoke with him periodically by telephone, and saw to it that Darragh consulted a competent psychiatrist. However, apart from noting Darragh's own averments of employment as a salesman, Tierney made no attempt to verify Darragh's employment.[2] Tierney also made no effort to confirm that Darragh was neither teaching nor working in an environment which would place him in close association with young boys.

Contrary to Darragh's representations, he was, in fact, teaching science at the Barnes Middle School in East Boston throughout the period of his probation. Between the fall of 1978 and his arrest in February, 1979, Darragh repeatedly molested M.M., then a sixth grade student. During January and February, 1979, Darragh sexually assaulted A.L., then thirteen years old. Darragh molested both boys in a locked storage room at the school and maintained secrecy by threatening to molest A.L.'s younger brother if A.L. told anyone of the assaults.

Despite a complaint by the mother of another student who witnessed Darragh's abusive behavior,[3] the school's principal, John T. Daley, took no definitive action to relieve Darragh of his teaching responsibilities. The episodes of abuse involved in this appeal came to light after M.M. and A.L. discussed their mutual problem. M.M. told another boy, who told his sis-

---

[2] Darragh told Tierney that he was employed as a salesman for the National Veterans War Memorial Shrine in Boston. Darragh was an officer of that organization. Tierney checked the telephone directory to ascertain whether the organization existed, but took no additional steps to determine whether Darragh actually worked there.

[3] In March, 1978, the mother witnessed Darragh's suspicious behavior toward a student in a school hallway. Darragh denied the allegations. School officials held a hearing, but the student did not wish to press charges. The principal did not investigate the matter further, and returned the witness's written complaint unopened. In November, 1978, M.M.'s mother complained to the principal that Darragh was paying her son an inordinate amount of attention. At that time, Darragh transported M.M. home from school, bought him lunch, and gave him money and gifts. The principal told her not to worry and said there was nothing to be done.

ter, who in turn told M.M.'s sister. M.M.'s sister notified their mother.

A.L., acting through his parents,[4] sued both the city of Boston and the Commonwealth under the Massachusetts Tort Claims Act. The Commonwealth's liability was premised on Tierney's negligent supervision of Darragh; the city's liability was premised on the principal's failure to act after being informed of the parent's suspicions about Darragh. M.M., acting through his mother,[5] sued both entities on the same grounds.

The city of Boston settled with each plaintiff prior to trial.[6] The jury found the Commonwealth liable and, as the judge instructed, deducted the city's settlement amount from its award to each plaintiff. The court allowed the city's motion for contribution from the Commonwealth and, accordingly, ordered the Commonwealth to pay the city $35,000, the difference between the amount of settlement and half the damages owed each plaintiff.[7]

With these facts in mind, we address the issue whether the Commonwealth is liable for the probation officer's negligent failure to ascertain Darragh's place of employment. In so doing, we must determine (1) whether the probation officer owed a duty to the plaintiffs in this case, and (2) whether the Commonwealth is liable under the Massachusetts Tort Claims Act for the probation officer's negligent violation of such a duty.

---

[4] At the time of trial, A.L. had reached his majority. A.L.'s parents also sued for negligent infliction of emotional distress. These claims were waived before trial.

[5] At the time of trial, M.M. had reached his majority. His mother pursued her own claim for negligent infliction of emotional distress. The judge directed a verdict for the Commonwealth on the mother's claim.

[6] By the terms of the settlement, the city agreed to pay each plaintiff $80,000.

[7] The jury awarded A.L. $130,000 in damages. The jury deducted the city's settlement of $80,000 from its damage award. The judge ordered the Commonwealth to pay $15,000 to the city. In the case of M.M., the jury awarded $120,000 in damages offset by the $80,000 paid by the city. The city had paid $20,000 more than its pro rata share which the judge ordered the Commonwealth to pay in contribution. In total, the Commonwealth was ordered to pay $35,000 to the city.

1. *The probation officer's duty.* "In order to recover against the [Commonwealth] for negligence [of the probation officer], the plaintiff must show (1) the existence of an act or omission in violation of a (2) duty owed to the plaintiffs by the defendant, (3) injury, and (4) a causal relationship between the breach of duty and the harm suffered." *Dinsky* v. *Framingham,* 386 Mass. 801, 804 (1982). The parties properly focus their arguments on *Dinsky* and on *Irwin* v. *Ware,* 392 Mass. 745 (1985). We conclude that the trial judge correctly determined that, "given the potential harmful effects upon the class sought to be protected," there was a duty owed to these plaintiffs, and that this case is closer to *Irwin* than it is to *Dinsky.*

In *Dinsky,* flooding damaged the plaintiffs' house because the house was located on an improperly graded lot. Prior to construction, the town's department of health had notified the building commissioner that the property should be graded "to prevent low spots that will not drain and create a public nuisance," and instructed the building commissioner to inspect the lot before issuing a building permit. The building commissioner issued the permit without inspecting the property, which was, indeed, improperly graded. *Dinsky, supra* at 802. We held the town not liable for its failure to inspect the lot prior to issuing the building permit, because "the purpose of a building code has been considered traditionally to be the protection of the general public," not protection of the property owner. *Id.* at 805. Thus, the building commissioner owed no special duty to the plaintiffs in *Dinsky.*[8]

---

[8] Subsequent cases have followed the *Dinsky* analysis. In *Ribeiro* v. *Granby,* 395 Mass. 608 (1985), we held that a municipality was not liable for the failure of a building inspector and members of the town's board of health to require installation of a second means of egress from the decedent's apartment. We concluded that the case was controlled by *Dinsky,* and that the town was not liable, because the events transpired at a relatively leisurely pace, and because the owners and the occupants could have taken steps to rectify or to avoid the danger themselves. *Ribeiro, supra* at 612.

In *Nickerson* v. *Commonwealth,* 397 Mass. 476 (1986), we held that the Commonwealth was not liable to an injured motorist for the Registrar of Motor Vehicles' failure to revoke an individual's automobile registration for

In *Irwin*, we held a municipality liable for the failure of its police officers to remove an obviously intoxicated driver from the road after the police had stopped the driver for driving too fast. Ten minutes later, the driver was involved in an accident which resulted in the deaths of the plaintiff's decedents. *Irwin, supra* at 764. We concluded that, where the negligent act of a public official threatens immediate and serious physical injury to an identifiable class, and the class has no chance to protect itself from the harm threatened, the official owes a duty of care to that class. *Id.* at 756. We noted, too, that the most critical factor in this analysis is whether a defendant could anticipate that he would be expected to act to protect the plaintiff and could foresee harm to the plaintiff resulting from his inaction. See *id.*

In analyzing this case under the criteria set forth in *Irwin*, we first address the question whether Tierney owed a duty to

---

nonpayment of insurance premiums. Applying *Dinsky*, we held the Commonwealth was not liable, because the Registrar owed no duty to the plaintiff beyond that owed to the public at large, and because there was no risk of immediate and foreseeable harm to a special class of persons who could not protect themselves from it, the hallmark of our analysis in *Irwin*. *Nickerson, supra* at 478.

In *Appleton* v. *Hudson*, 397 Mass. 812 (1986), the plaintiff brought suit against the town of Hudson, alleging that the selectmen and town administrator had failed to take action against a local club which served liquor to minors. We concluded that the plaintiff could not recover against the town because, unlike *Irwin*, the town officials had not failed to stop an identifiable perpetrator who presented an immediate risk of harm. Furthermore, we concluded that the municipality's general duty to provide adequate police protection to neighborhood streets was precisely the type of duty the public duty rule was intended to protect. *Appleton, supra* at 816.

In *Connerty* v. *Metropolitan Dist. Comm'n*, 398 Mass. 140 (1986), we held that the Metropolitan District Commission owed no special duty to the plaintiff, a licensed clam digger, beyond that owed to the public at large, to refrain from contaminating waters in the Commonwealth. We concluded that the Commonwealth's environmental statutes were intended to protect the general public, the environment, and private landowners whose property was damaged by prohibited discharges, but that no statute created a duty to compensate individuals who harvested shellfish from public waters. *Connerty, supra* at 145-146.

these plaintiffs beyond the duty he owed to the general public. As we noted in *Irwin*, "[w]hile several different categories of such special relationships are recognized in the common law, they are based to a large extent on a uniform set of considerations. Foremost among these is whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so. . . . It has been said that such foreseeability can be based on reasonable reliance by the plaintiff, impeding other persons who might seek to render aid, statutory duties, property ownership or some other basis." (Citations omitted.) *Id.* at 756. We think that the conditions of probation imposed by the sentencing judge created a special relationship between these plaintiffs and the probation officer and created a duty beyond that owed to the public as a whole.

It is clear that the sentencing judge's conditions of probation were designed to protect young boys. The sentencing judge determined that Darragh would molest again if he entered an environment in which he was permitted frequent association with young boys.[9] The probability that harm would result from allowing Darragh to teach or to associate with young boys was foreseeable both to the judge and to Tierney, who knew the terms of the probation and was familiar with Darragh's criminal record.

The Commonwealth asserts that, even if it was foreseeable that Darragh would molest young boys again, the probation officer owed no special duty to these plaintiffs. The Commonwealth argues that G. L. c. 276, § 85 (1986 ed.), which defines the duties of probation officers, creates a duty to the courts alone. We do not agree. The duties outlined in G. L. c. 276, § 85, clearly are not intended to be an exhaustive list of the duties of probation officers. Although the statute provides that probation officers "shall perform such . . . duties as the court

---

[9] One of Darragh's prior convictions also involved his molesting young boys while a teacher in a public school system other than Boston. The other incidents took place while Darragh was employed at two swimming pools, at least one of which was a Metropolitan District Commission pool.

requires," this language does not exclude all other duties. Historically, the purpose of probation in Massachusetts has been to aid probationers in becoming law-abiding citizens. Indeed, Massachusetts was the first State to use probation and did so prior to any statutory enactment. Thus, in this Commonwealth, a probation officer's duty never has been limited to service of the court alone. See Carter, Some Aspects of Massachusetts Probation Law and Practice, 42 B.U.L. Rev. 32, 32-33, 38-39 (1962).

The duties of each probation officer are defined and informed by the specific instructions of the sentencing judge. See ABA Standards Relating to the Administration of Criminal Justice §§ 3.1-3.2, at 398 (1974) (noting that conditions of probation appropriately deal with many matters designed to help probationer lead a law-abiding life, and that specific conditions of probation should not be required by statute, but by the sentencing judge's instructions). Although it is the function of the sentencing judge to set the conditions of probation, the conditions are meaningless without the probation officer's enforcement. See generally Carter, *supra*. Thus, Tierney's duty was defined by the judge's conditions of probation.

The Commonwealth next contends Tierney owed no duty to the plaintiffs, because the events in this case followed a leisurely course. In making this argument, the Commonwealth points out that the acts of molestation complained of took place nine months after Darragh's sentencing. The Commonwealth asserts that the time frame involved in this case renders *Irwin,* in which the court noted the temporal immediacy of the threatened harm, inapposite. The difference in the temporal immediacy between the accident in *Irwin* and the acts of molestation involved in this case does not dispose the issue of liability. Even though the nine months between Darragh's placement on probation and the first acts of sexual abuse in this case are much longer than the ten minutes involved in *Irwin,* the expanded time frame in this case is accompanied by a chronic, persistent, and known threat that Darragh, an identifiable perpetrator, would molest young boys. Where officials know of such a chronic and obvious threat of harm to known

victims, we do not ascribe a talismanic significance to the temporal immediacy of the harm. Rather, we analyze the temporal immediacy aspect of *Irwin* in terms of the type of danger at issue. As it concerns driving while under the influence of intoxicating liquor, the time frame involved is necessarily short because alcohol usually has a temporary effect. However, the threat of child sexual abuse is a continuing danger which persists over a longer period.

Moreover, one of the primary reasons for considering temporal immediacy is to determine whether the threatened persons have an opportunity to protect themselves. In *Irwin*, only the police officers who knew that a drunk driver was on the road were in a position to prevent the harm. The same can be said of Tierney in this case. Tierney was the only person who had the knowledge which could have protected the plaintiffs. See *Irwin, supra* at 764.

Clearly, the children's parents could not protect them from Darragh.[10] Parents have no power to hire or fire teachers. At best, parents can bring teacher misconduct to the attention of school officials. Indeed, it was a parent who brought Darragh's misconduct to the attention of school authorities. Unfortunately, however, parents can only report misconduct after the fact of its occurrence. Children, of course, also cannot easily protect themselves from adult misbehavior. Darragh's threats silenced the children and prevented the parents from learning of his activities from them for a period of several months. In these circumstances, any suggestion that parents could have protected their children from Darragh's molestation is in error.

---

[10]Parents, as members of the public, would be denied access to teacher's criminal record even if they suspected misconduct. See G. L. c. 6, § 172 (1986 ed.), which denies the public access to criminal records and affirmatively provides "a mechanism whereby the fact of a prior conviction is, in most instances, shielded from public view." *New Bedford Standard-Times Publishing Co.* v. *Clerk of the Third Dist. Court of Bristol,* 377 Mass. 404, 412 (1979), quoting *Rzeznik* v. *Chief of Police of Southampton,* 374 Mass. 475, 479 (1978). Thus, the parents were not able to prevent harm to their children by ascertaining the teacher's record.

Although the school officials in this case were in a position to protect these plaintiffs from Darragh, we agree with the conclusion of the judge that the school principal's failure to respond to a parent's complaint about suspicious behavior on Darragh's part is not an intervening, superseding cause of the plaintiffs' injuries which would relieve the Commonwealth of liability. The failure of a third party to prevent the harm threatened by a defendant's negligence will not absolve the original wrongdoer of liability. See *Mitchell* v. *Lonergan*, 285 Mass. 266 (1934); *Farley* v. *Edward E. Tower Co.*, 271 Mass. 230 (1930). Moreover, even if we assume negligence on the part of the school principal, only unusual, extraordinary negligence of a third party will excuse an original tortfeasor's liability. See W.L. Prosser & W.P. Keeton, Torts 312 (5th ed. 1984).

For these reasons, we conclude that Tierney had a duty to these plaintiffs to make a reasonable effort to verify the place of Darragh's employment. As the judge stated, "other than receiving [Darragh's] assurances that he was not teaching and was otherwise employed, [the probation officer] did nothing affirmatively to confirm the nature of the non-teaching employment, or to verify that [Darragh] was not in fact teaching within the Commonwealth or elsewhere." (Footnotes omitted.) Tierney easily could have required Darragh to produce a payroll stub or other evidence of employment which would have alerted the probation officer to Darragh's deception and could have saved these plaintiffs from the terrible harm inflicted by Darragh. Tierney alone was in a position to avert this tragedy; accordingly, we conclude that Tierney had a duty to make a reasonable effort to verify Darragh's employment.[11]

2. *The Commonwealth's liability.* The Commonwealth raises two other arguments as to why it has no liability under the Massachusetts Tort Claims Act.

---

[11] We stress the fact that we do not require probation officers to control the behavior of the probationers in their charge. We only require probation officers to make a reasonable effort to ascertain whether probationers have complied with the conditions of their probation and to bring any violations to the sentencing judge's attention.

a. *Discretionary function.* The Massachusetts Tort Claims Act, G. L. c. 258, § 2, provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances . . . ." The Act exempts from liability "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." G. L. c. 258, § 10 (*b*) (1986 ed.). The Commonwealth argues that probation officers' duties are discretionary within the meaning of G. L. c. 258, § 10 (*b*). We do not agree.

The Legislature enacted G. L. c. 258, § 10 (*b*), shortly after our decision in *Whitney* v. *Worcester*, 373 Mass. 208 (1977), and we continue to look to the principles enunciated in *Whitney* to guide our determinations of the intended scope of G. L. c. 258, § 10 (*b*). *Irwin* v. *Ware*, 392 Mass. 745, 753 (1984). *Petrazza* v. *Commonwealth*, 398 Mass. 464, 467 (1986). In *Whitney* v. *Worcester*, *supra* at 218, we determined that government officials are immune from suit, "[w]hen the particular conduct which caused the injury is one characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy and planning . . . ." By contrast, we impose governmental liability "when the particular conduct claimed to be tortious involves . . . the carrying out of previously established policies or plans." *Id.* In this case, Tierney failed "to act carefully in accordance with delegated authority." *Cady* v. *Plymouth-Carver Regional School Dist.*, 17 Mass. App. Ct. 211, 214 (1983).

There is no reasonable basis to support the Commonwealth's argument that a probation officer's duty to monitor a probationer's compliance with the terms of his or her probation involves policy or planning judgment as defined in *Whitney*. Rather, policy decisions with respect to a probationer are made

by the sentencing judge, who places the convicted defendant on probation and sets the terms of the probation. The probation officer's monitoring of the probationer's compliance with the probation primarily is an administrative function. We recognize, of course, that probation officers exercise their judgment in carrying out the court's orders. However, as we noted in *Whitney*, acts requiring the exercise of judgment do not automatically acquire governmental immunity. "[T]he performance of all functions involves the exercise of discretion and judgment to some degree." *Whitney, supra* at 219. As the Appeals Court has noted, *Cady, supra* at 215, an act is discretionary "[i]f the public employee is required to decide and act without fixed or readily ascertainable standards to fall back upon . . . . Conversely, if there is a readily ascertainable standard by which the action of the government servant may be measured, whether that standard is written or the product of experience, it is not within the discretionary function exception. . . . It requires no manual, for example, to instruct an installer of street lights in Boston that the wind may blow mightily and that lightposts had better be anchored accordingly." (Citations omitted.) Monitoring the conditions of probation is not a job function a probation officer performs at his or her discretion. It is instead a duty performed in compliance with a probation officer's obligation to perform such duties "as the court requires." G. L. c. 276, § 85 (1986 ed.). The statute governing the duties of probation officers clearly establishes a relationship between the court and the probation officer whereby the probation officer is required to fulfil his or her obligations pursuant to the policy decisions of the sentencing judge. A probation officer's duty to make reasonable efforts to ascertain whether a probationer has complied with the terms of his or her probation is not a discretionary function within the meaning of G. L. c. 258, § 10 (*b*).

b. *Immunity*. The Commonwealth contends that the negligent acts of a District Court probation officer may not impose liability on the Commonwealth, because probation officers enjoy absolute immunity from suit when performing duties at the direction of a judge. The Commonwealth relies on our decision

in *Temple* v. *Marlborough Div. of the Dist. Court Dep't*, 395 Mass. 117, 132 (1985), in which we ruled that judges enjoy immunity from suit if the wrong alleged occurred while the judge was performing a lawfully permitted act within his or her discretion. We also noted that court clerks "enjoy a qualified immunity from suit and are absolutely immune for their conduct when acting at a judge's direction." *Id.* at 133. The Commonwealth contends that the same immunity principles that apply to court clerks should apply to Tierney. We do not agree.

The plaintiffs allege that Tierney negligently failed to verify Darragh's place of employment. Liability thus is premised on Tierney's negligent failure properly to follow the court's directives. The Commonwealth may not invoke Tierney's possible immunity unless Tierney acted pursuant to a judge's directive or otherwise in aid of the court. The evidence in this case indicates just the opposite. Any claim to immunity which the Commonwealth might have asserted ceased when Tierney failed to aid in the enforcement of the conditions of Darragh's probation. See *Acevedo* v. *Pima County Adult Probation Dep't*, 142 Ariz. 319 (1984). For the foregoing reasons, we affirm the judge's determination that the Commonwealth is liable under G. L. c. 258, § 2, for the negligent acts of Tierney.

3. *Contribution.* The Commonwealth contends that the judge erred in ordering the Commonwealth to contribute $35,000 to the city of Boston. The city settled with the plaintiffs prior to trial; at trial, the Commonwealth was allowed to reduce the amount of each plaintiff's damages by the amount of the city's settlement. The jury determined the amount of liability in each case, and, as it happened, the city had paid more than its pro rata share. The judge therefore allowed the city's motion for contribution.

Contribution among joint tortfeasors is governed by statute. See G. L. c. 231B, § 1 (*a*). That statute provides that, "where two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them." As this court has stated, "[t]he contribution statute is aimed at eliminating the unfairness of

allowing a disproportionate share of a plaintiff's recovery to be borne by one of several joint tortfeasors. The object to be accomplished is a more equitable distribution of that burden among those liable in tort for the same injury." *McGrath* v. *Stanley*, 397 Mass. 775, 780-781 (1986).

The Commonwealth asserts that third-party defendants are not compelled to contribute a pro rata share of damages to a tortfeasor because a third-party defendant does not share joint liability to the plaintiff.[12] The flaw in this argument is that the Commonwealth does not stand in the position of a third-party defendant. The Massachusetts Tort Claims Act makes the Commonwealth a defendant directly liable to an injured plaintiff for the negligent acts of its employees. Thus, the city was entitled to seek contribution against the Commonwealth as a joint tortfeasor.

The Commonwealth also contends that the city is not entitled to recover contribution against the Commonwealth because the amount paid to M.M. in settlement was not reasonable in light of the disparate amounts of the damages awarded to the plaintiffs.[13] In granting the city's motion for contribution, the judge found that the amount of the settlement was reasonable given the potential total liability of the city and the Commonwealth. That finding is not erroneous. We do not think that the $10,000 difference between A.L.'s and M.M.'s recoveries makes the settlements unreasonable. We affirm the judge's allowance of the city of Boston's motion for contribution.

*Judgments affirmed.*

---

[12]The Commonwealth's reliance on *Liberty Mut. Ins. Co.* v. *Westerlind,* 374 Mass. 524 (1978), is misplaced. That case held that an employer paying workers' compensation to an employee under the worker's compensation act, G. L. c. 152, by statute was "released from all tort claims . . . [the employer] might have as a result of [the employee's] accident." *Id.* at 526. That principle is inapplicable where liability is based on the Massachusetts Tort Claims Act and not on the workers' compensation act.

[13]General Laws c. 231B, § 1 (*c*), provides, "A tortfeasor who enters into a settlement with a claimant shall not be entitled to recover contribution from another tortfeasor in respect to any amount paid in a settlement which is in excess of what was reasonable."

HENNESSEY, C.J. (concurring). I agree with the reasoning of Justices Abrams, Wilkins, and Liacos, and with the result to which it leads them. I write separately only to emphasize that we today apply, not abrogate, the so-called "public duty" and "special relationship" rules.

The Massachusetts Tort Claims Act (Act), G. L. c. 258 (1986 ed.), provides in § 2 that "[p]ublic employers shall be liable for . . . the negligent or wrongful act or omission of any public employee . . . in the same manner and to the same extent as a private individual under like circumstances . . . ." This language does not create any new theories of liability, but simply provides that tort actions brought against governmental entities are governed by the same theories of liability that apply to actions involving private parties. *Dinsky* v. *Framingham*, 386 Mass. 801, 804-805 (1982). A problem arises, however, because many governmental functions, e.g., penal incarceration, probation, and parole functions, have no analogues in private sector law; and others, e.g., police protection, building inspection, have only imperfect analogues. In applying theories of liability derived from private sector law to such traditionally "public" governmental functions, the court understandably has been circumspect. "[F]airness to the injured individual cannot be the sole controlling factor in this context. Desirable as it might be to structure a system of cost-benefit distribution in which no tortious injuries would go uncompensated, the fact that we are here dealing with governmental entities vastly complicates the issue of the appropriate scope of tort liability. . . . An appropriate balance should be struck between the public interest in fairness to injured persons and in promoting effective government." *Whitney* v. *Worcester*, 373 Mass. 208, 215-216 (1977). That balance has been struck, in a series of cases, by denying relief where the defendant governmental entity breached a duty owed to the "general public," and not to the plaintiff as an individual, see *Dinsky* v. *Framingham, supra* at 805-806, and its progeny, cited *ante* at 239 n.8; but granting relief where there is a "special relationship" between the plaintiff and the defendant, see *Irwin* v. *Ware*, 392 Mass. 745 (1984).

In this case, the plaintiffs have a special relationship to the probation officer which satisfies this requirement and takes this case out of the realm of public duty. This special relationship arose from the highly specific condition of probation that identified a special class of persons (boys in a teacher-pupil relationship with Darragh) within the risk of "immediate and foreseeable physical injury . . . who cannot reasonably protect themselves from it." *Irwin, supra* at 756. The plaintiffs, as members of this class intended to be specially protected, were owed a duty of care beyond that owed to the public as a whole. But not every case of recidivism by a probationer or parolee gives rise to liability. Had Darragh molested not a student of the school where he was teaching, but a young boy he encountered at a local playground or in some other extrascholastic context, a different case would be presented. And in the more typical case, the generality of conditions of probation or parole that do not specify an identifiable class of persons intended to be specially benefited does not create a special relationship between the probation or parole officer and any individual member of the public. In the absence of such a special relationship, there is no duty owed, and there may be no recovery against the Commonwealth.

NOLAN, J. (dissenting, with whom Lynch, J., joins). The instant case falls somewhere between the fact patterns of *Dinsky* v. *Framingham*, 386 Mass. 801 (1982), with its "relatively leisurely course of events," *Irwin* v. *Ware*, 392 Mass. 745, 756 (1985), and that of *Irwin*, where the threat posed was imminent and of great magnitude. Factually, I note several distinctions between *Irwin* and the instant case. A fundamental difference is that, in *Irwin*, the police officers were *aware* of the motorist's intoxicated state and thus were cognizant of the imminent and foreseeable threat that he posed if not taken into custody. Here, the probation officer had no such awareness of the danger posed by Darragh's teaching since the probationer had lied about his employment. Also, there is no question that the intoxicated motorist could not have injured others that evening if he had been removed from the road by the police of-

ficers. There is no such assurance, even if the probation officer had discovered Darragh's employment and prevented him from teaching, that Darragh could not have had access to, and molested other children. I note that the threat posed in *Irwin* was one of imminent, grave risk of injury or death; hence, the type of harm involved there was quite different.

It was emphasized in *Irwin* that the victims had no chance to protect themselves. In essence, the police officers constituted the only barrier between the intoxicated driver and other motorists. In the instant case, while I agree that the children could not protect themselves, the probation officer was only one individual out of several groups. For example, the parents, other school teachers, and the school principal were committed to caring for the children's needs as well as supervising and protecting them. In addition, the danger posed was not of the same temporal immediacy as in the *Irwin* case. The motorist in *Irwin* was involved in the fatal crash just ten minutes after he spoke with the police officers. *Irwin* v. *Ware, supra* at 765. Here, it cannot reasonably be said that Darragh instantly posed such an obvious danger to the population of the school. Lastly, the police officers in *Irwin* were required, as part of their sworn duty, to interrogate operators acting suspiciously, and to detain or to arrest individuals appearing to be intoxicated. In *Irwin*, the particular statutory scheme at issue imposed a special duty on the police to the motoring public. *Id.* at 755. Hence, it is clear that *Irwin* v. *Ware, supra,* is distinguishable from the present case on both its facts and statutory framework.

Today's decision raises the serious question as to where the court will stop in extending liability. The court seems to be making every effort to make Massachusetts the bonanza capital of the nation to the detriment of good order and the long suffering taxpayers. For these reasons, I dissent.

O'CONNOR, J. (dissenting, with whom Lynch, J., joins). In my view, the court's decision increases the already substantial confusion about government's liability for injuries and losses indirectly sustained by private individuals as a result of a public

officer or employee's unreasonable failure to do his job.[1] Furthermore, the decision unwisely skews the necessary balance between compensating injured individuals and maintaining effective and stable government. In *Dinsky* v. *Framingham*, 386 Mass. 801 (1982), the court made a suitable beginning toward formulating a set of workable principles relative to public tort liability for indirectly caused injuries and losses to private individuals. As a result of subsequent decisions, however, starting with *Irwin* v. *Ware*, 392 Mass. 745 (1984), and culminating in today's decision, the promise of that beginning has not been achieved. The court must get back on track, and resume the development of a body of public tort law that will be capable of producing principled and predictable dispute resolutions in harmony with sound public policy.

General Laws c. 258, § 2 (1986 ed.), provides that "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent . . . act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances . . . ." Under c. 258, § 2, public employers are no more immune from liability for the negligence of their officers and employees in the course of their employment than are private employers in similar circumstances. But, c. 258, § 2, does not address the factors that determine the underlying question whether a public officer or employee has been negligent. The analysis involved in a determination whether a public officer or employee has been negligent is the same as that involved in considering the possible negligence of anyone else. See *Dinsky* v. *Framingham, supra* at 804-805.

---

[1] This is not a case in which a public employee's activity has resulted in direct harm to an individual, such as a municipal motor vehicle operator's careless driving causing an accident. Rather, this is a case, like *Dinsky* v. *Framingham*, 386 Mass. 801 (1982), and its progeny, in which a public employee's failure to protect a plaintiff from the acts of others, as required by his employment, has indirectly caused harm to the plaintiff. The discussion in this opinion is limited to the latter type of case. See generally Glannon, The Scope of Public Liability Under the Tort Claims Act: Beyond the Public Duty Rule, 67 Mass. L. Rev. 159, 166 (1982).

A person is not negligent toward another unless he owes the other a duty to be careful. *Theriault* v. *Pierce*, 307 Mass. 532, 533 (1940). Whether he owes such a duty is a question of law. *Monadnock Display Fireworks, Inc.* v. *Andover*, 388 Mass. 153, 156 (1983). *Altman* v. *Aronson*, 231 Mass. 588, 591 (1919). Existing social values and customs and appropriate public policy determine the circumstances in which the court will declare the existence of such a duty. See *Schofield* v. *Merrill*, 386 Mass. 244, 246-251 (1982). Foreseeability of harm is one, but only one, relevant factor in the public policy assessment. *Id.* See *Marshall* v. *Ellison*, 132 Ill. App. 3d 732 (1985).

In this case, as in *Dinsky* v. *Framingham, supra, Irwin* v. *Ware, supra, Ribeiro* v. *Granby*, 395 Mass. 608 (1985), *Nickerson* v. *Commonwealth*, 397 Mass. 476 (1986), and *Appleton* v. *Hudson*, 397 Mass. 812 (1986), all cases involving a question of public tort liability for indirect losses caused by the failures of public employees, the critical question is whether this court, as a matter of law, should impose on the particular public officer or employee a duty, owed not just to the public as a whole, but to the individual plaintiffs as well, to exercise care for the plaintiffs' welfare. Stated another way, the question is whether an individual, who suffers an injury as a result of a public officer or employee's careless dereliction of his public duty, should be entitled to recover, and, if so, in what type of cases. See Glannon, The Scope of Public Liability Under the Tort Claims Act: Beyond the Public Duty Rule, 67 Mass. L. Rev. 159, 166 (1982).

Since the question is one of public policy, *id.*, see *Orzechowski* v. *State*, 485 A.2d 545 (R.I. 1984), a satisfactory answer not only must promise predictable results but also must reflect a reasonable balance between competing values; the compensation of injured individuals and the protection of government from financial burdens of such magnitude as to threaten government's ability to function effectively. See *Dinsky, supra* at 810. In light of the myriad situations in which private individuals interact with public officers and employees, it is essential to affordable government that the court devise a rule limiting

government's liability for indirect harm (see note 1, *supra*) caused by a public officer or employee's failure to do his job. See *Whitney* v. *Worcester*, 373 Mass. 208, 216 (1977).

Recognition of the threat to government posed by liability for indirect harm without substantial limitation has led a majority of jurisdictions to embrace the so-called public duty rule, which holds that the employment duties of public servants are generally owed only to the public, and are enforceable only administratively or by criminal proceedings. However, those jurisdictions also have recognized that special circumstances relative to an individual's relationship with a governmental agency, officer, or employee sometimes exist, and that, despite concerns about the public treasury, they demand that the individual be accorded special treatment in the form of a private right of action for the harm he has sustained. The result has been the adoption of two exceptions to the public duty rule.

One of these exceptions is that, when a statute *specifically and expressly provides* that a public servant's employment duties are designed to benefit a class of individuals identified in the statute, those individuals are owed a special duty violation of which will support a private cause of action. For example, in *Halvorson* v. *Dahl*, 89 Wash. 2d 673, 677 (1978), a case involving allegations of negligence on the part of building inspectors, the applicable housing code described certain conditions as "dangerous and a menace to the health, safety, morals or welfare *of the occupants of such buildings and of the public*," and it provided that the purpose of the code was to address such conditions (emphasis added). In concluding that, by its failure to enforce the housing code, the defendant municipality became liable for the death by fire of an occupant of a building to which the code applied, the Supreme Court of Washington reasoned that "[t]he Seattle Housing Code is an ordinance enacted for the benefit of *a specifically identified* group of persons *as well as, and in addition to*, the general public" (emphasis added). *Id.* The statutory intent exception to the public duty rule, relied on in *Halvorson*, is sharply limited to regulations (statutory or otherwise) containing language expressly identifying particular groups as intended beneficiaries.

It has been infrequently applied. "Despite numerous references to the statutory intent rationale, it is difficult to find cases which hold that a statute creates a special duty to a particular class of persons." Glannon, *supra* at 163.

The other entirely distinct, and more frequently applied, exception to the public duty rule holds that a public servant's duty runs to specific individuals, as well as to the general public, when a "special relationship" exists between those individuals and the public agency or servant. It would be impractical, and perhaps futile, to attempt to identify all the situations in which courts subscribing to the public duty rule have declared the existence of a special relationship sufficient to support liability. It is clear, however, that judicial concern about the imposition of oppressive financial burdens on government has led courts sharply to limit recognition of special relationships to cases in which the plaintiff has a far more compelling claim than the plaintiffs have had in *Irwin* v. *Ware*, *supra*, and its progeny. See, e.g., *Tarter* v. *State*, 68 N.Y.2d 511, 519 (1986) ("any claim based upon the negligent supervision of . . . parolees must fail because of the complete lack of allegations of both a special duty to protect the claimants as identified individuals and the reliance on the part of the claimants on specific assurances of protection"); *Ashburn* v. *Anne Arundel County*, 306 Md. 617, 631 (1986) ("In order for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection"); *Marshall* v. *Ellison*, *supra* at 735-737 (specifically rejecting the foreseeability of harm approach taken by the court in *Irwin* v. *Ware*, *supra*); *Warren* v. *District of Columbia*, 444 A.2d 1, 10 (D.C. App. 1981) (Kelly, J., concurring in part and dissenting in part) (no liability where police officer failed in his duty to obtain identification of plaintiff's attacker in violent confrontation witnessed by officer thereby preventing plaintiff from suing the attacker, because the officer had not given the plaintiff a specific assurance of protection justifying reliance by the plain-

tiff). A common thread running through these cases applying the "special relationship" exception is that the public agency, officer, or employee has expressly or impliedly represented to the plaintiff that special care would be taken for his protection, thus justifying the plaintiff's reliance on the employee's carrying out his responsibility. See *Irwin* v. *Ware, supra* at 775 (Nolan, J., dissenting with whom Lynch & O'Connor, JJ., joined).

Although this court has purported to adopt the public duty rule and its rationale, it has expanded the rule's exceptions to the degree that there is little left to the rule in this Commonwealth. Furthermore, the rule as it has been applied by this court has not yielded predictable results nor has it served the purpose for which the traditional public duty rule was created.

The evolvement of the Massachusetts rule began with *Dinsky* v. *Framingham*, 386 Mass. 801 (1982). In *Dinsky*, the defendant town's department of health authorized the town's building commissioner to issue a building permit for the construction of the plaintiffs' home on the condition that the lot be graded so as to prevent low spots in which water might collect. The building commissioner issued building and occupancy permits although the grading requirement had not been met. The plaintiffs purchased the home, which thereafter sustained property damage due to flooding, and then brought an action against the town alleging negligence in the issuance of the permits. After a trial, the judge directed a verdict for the town "on the ground that the town owed the plaintiffs no duty of care beyond that owed to the public at large." *Id.* at 802. On appeal, this court affirmed, after announcing that "we will not depart from the majority rule that in the absence of a special duty owed to the plaintiffs, different from that owed to the public at large, no cause of action for negligent inspection can be maintained." *Id.* at 810. The court concluded that the first exception to the public duty rule, the statutory intention exception, did not apply. There was no separate discussion of the "special relationship" exception.

The next relevant case was *Irwin* v. *Ware, supra.* There, two town police officers failed to take into custody an intoxi-

cated motor vehicle operator they had stopped, and ten minutes later the vehicle collided with another vehicle killing two of its occupants and injuring two others. The court considered the question whether the officers owed a duty of care to those individuals, violation of which would support liability. By a four-to-three decision, the court concluded that such a duty existed. The court reasoned that "the applicable statutes [created] a duty to the motoring public with respect to intoxicated motorists discovered by the police upon which tort liability may be based." *Id*. at 755. The court came to that conclusion despite its recognition, *id*. at 755-759, that there was no express provision in the "applicable statutes" identifying a particular segment of the public as intended beneficiaries thereof, and that therefore the *Halvorson* statutory intention exception discussed in *Dinsky, supra*, did not apply. The court's holding that the police officers nevertheless owed a special duty to the victims appears to have been based not only on a broadly expanded version of the statutory intention exception but on a nontraditional version of the special relationship exception as well a version that ignored the lack of any special undertaking or representation directed particularly to the plaintiffs that induced their detrimental reliance on the officers' performance of their duty. In light of the "statutes giving police officers the right to deal with intoxicated persons," *id*. at 759, the court simply concluded that, "[w]here the risk created by the negligence of a municipal employee is of immediate and foreseeable physical injury to persons who cannot reasonably protect themselves from it, a duty of care reasonably should be found." *Id*. at 756. In effect, by radically modifying the exceptions to the traditional public duty rule, the court formulated a new rule in favor of individual plaintiffs at the cost of imposing unacceptably heavy financial burdens (notwithstanding damages limitations provided in G. L. c. 258, § 2) on government for indirectly caused injuries.

The rule announced and applied in *Irwin* v. *Ware, supra*, is unwise not only because of the heavy burden it places on government, but also because it has proven difficult, if not impossible, to apply evenhandedly and without an orientation

to result. In *Ribeiro* v. *Granby*, 395 Mass. 608 (1985), the plaintiff administrators of the estate of their son, James A. Ribeiro, sought damages for Ribeiro's death by fire in an apartment containing only one egress. The plaintiffs alleged the negligence of town officials in failing to require a second egress. This court denied liability on the ground that, unlike the situation in *Irwin* v. *Ware*, "[t]he danger was discernible for many months before the harm occurred," and the owners and the occupants could have taken measures to rectify or to avoid the danger. *Ribeiro, supra* at 612. Thus, the court concluded, "[g]ood policy . . . strongly indicates that the liability, if any, on the facts shown . . . must be left only on the owners of the property." *Id.* at 613.

Eight months after deciding *Ribeiro*, the court held in *Nickerson* v. *Commonwealth*, 397 Mass. 476 (1986), that the Commonwealth cannot be held liable to a person injured on the highway by an uninsured motor vehicle whose registration had not been revoked by the Registrar of Motor Vehicles as required by law. The court held that the Registrar owed no duty to the plaintiff, explaining, *id.* at 478, that "[t]he plaintiff's case is not advanced by *Irwin* v. *Ware* . . . because there this court ruled that the risk created by the negligence of the police in failing to arrest the intoxicated operator of a motor vehicle was foreseeable and because relevant statutes evidence a legislative intent to protect both the intoxicated person and other users of the highway. Further, unlike the instant case, the risk in *Ware* was 'of immediate and foreseeable physical injury to persons who [could not] reasonably protect themselves from it.' *Id.* at 756." One might reasonably question whether, apart from the immediacy of the threat posed by the public servant's error, there was significant distinction between the facts of *Nickerson* and the facts of *Irwin*. Surely, it was foreseeable to the Registrar that a registered but uninsured vehicle might injure someone designed to be protected by compulsory insurance laws, and surely Nickerson, who was changing a tire at the edge of the road when he was struck, was no more able to protect himself from being struck by an uninsured vehicle than the plaintiffs were able to protect themselves from the drunken driver in *Irwin*.

In *Appleton* v. *Hudson*, 397 Mass. 812 (1986), the plaintiff was injured and her husband was killed in an automobile accident on River Street in Hudson. The plaintiff, individually and as administratrix of her husband's estate, brought an action to recover damages based in part on a claim that town officials had been warned by the Appletons about persistent underage drinking at a club on River Street and about dangerous speeding conditions there. The plaintiff claimed that the officials had negligently failed to monitor and correct that situation. As a result, the plaintiff alleged, the Appletons' vehicle was struck on River Street at about 1 A.M., June 26, 1982, by a vehicle occupied by three intoxicated minors who had purchased liquor illegally at the club and at other establishments licensed by the town. The vehicle containing the youths had been racing along River Street at speeds over ninety miles per hour and had crossed into the wrong lane before colliding with the Appletons' vehicle, causing the injury and death complained of. Reasoning that, "[u]nlike the situation in *Irwin*, there was no foreseeably identifiable perpetrator whom the town negligently failed to remove from the highways," and that the risk was not "immediate," the court held that there was no special duty owed to the Appletons and hence there was no liability. *Id.* at 816. It is noteworthy that, in *Appleton*, the court properly did not suggest that the Appletons were in a position to protect themselves. Indeed, they had attempted to protect themselves by complaining to town officials about conditions on River Street. Thus, the foreseeability of harm and the Appletons' inability to protect themselves did not result in the court's recognition of causes of action. The key difference between *Appleton* and *Irwin* appears to have been the immediacy of the foreseeable risk.

Now, the court concludes that, in material respects, the present case is like *Irwin* v. *Ware*, and not like *Dinsky, Ribeiro, Nickerson,* and *Appleton,* and therefore the plaintiffs have a right of action against the Commonwealth. The court reasons that "the conditions of probation imposed by the sentencing judge created a special relationship between these plaintiffs and the probation officer and created a duty beyond that owed

to the public as a whole" (*ante* at 241) because of several factors: (1) the conditions of probation were designed to protect young boys such as the plantiffs; (2) it was foreseeable that the probation officer's failure to monitor the nature of the probationer's employment would create a risk of the harm that occurred and that the conditions of probation were designed to prevent; (3) even though nine months had elapsed between the imposition of probation and the molestation of the boys, the threat to the boys was a chronic, persistent, and known threat involving an "identifiable perpetrator," and (4) the boys could not have reasonably protected themselves nor could their parents protect them.

This case cannot fairly be distinguished from *Ribeiro*, *Nickerson*, and *Appleton*. In each of those cases, the relevant statutory regulations, like the conditions of probation here, were designed to protect the victims (among others). In each of those cases, it was foreseeable that the public employee's failure to do his job carefully would create a risk of the harm that occurred and that the relevant regulation was designed to prevent. In each of those cases, the foreseeable harm was not immediate as it had been in *Irwin*. Surely in *Nickerson* and *Appleton*, and probably in *Ribeiro* as well, the plaintiffs were not in a position to protect themselves. Yet, in each of those cases, the plaintiffs lost. Here, the plaintiffs have won. Why?

The point is that the "rule" that has emerged in the Commonwealth really is a "nonrule." Either all or none of the plaintiffs in the cases discussed above should have been entitled to recover. Under the traditional public duty rule, none would have been entitled to recover, for that rule makes exceptions only where a statute expressly provides that it is intended to benefit a class of identifiable individuals; or, in the alternative, where the public body or its officer or employee has given an express or implied assurance specifically to a plaintiff, in addition to that made to the general public, which fairly justifies detrimental reliance by that plaintiff. This court should follow the traditional public duty rule. It may be less than perfect, but it has the important virtue of being reasonably predictable, and it properly recognizes as a fact of life that government is unduly

burdened by a rule that permits recovery in any of the situations presented by *Dinsky*, *Irwin*, and their progeny. It is not unfair in such cases that plantiffs must look for compensation only to those persons directly responsible for their injuries. I would reverse the judgments.